OF THE

# STATE OF NEW JERSEY,

## ON APPEAL FROM THE COURT OF CHANCERY,

NOVEMBER TERM, 1884.

| 39 | 279 |
| 52L | 213 |
| 39 | 279 |
| 50 | 138 |
| 39 | 279 |
| 53 | 202 |
| 39 | 279 |
| 57 | 324 |
| 39 | 279 |
| 59 | 242 |
| 39 | 279 |
| 61 | 401 |
| 61 | 407 |
| 62 | 358 |
| 62 | 359 |
| 62 | 520 |
| 39 | 279 |
| 64 | 321 |
| 39 | 279 |
| 65 | 364 |

GEORGE HARRAL et al., appellants,

*v.*

CLAIRE HARRAL, respondent.

1. Under the laws of France, by a marriage without a contract as to property, a community of property between the husband and wife is established as an incident of the marriage. During coverture the husband has the control and management of the community property, and he may dispose of his share of the common property by his will; but the wife's share—that is, the one-half of the community property—the husband cannot dispose of, and she will be entitled to it on his death.

2. A person *sui juris* may change his domicile as often as he pleases. To effect such a change, naturalization in the country he adopts as his domicile is necessary.

3. To effect a change of domicile there must be a voluntary change of residence; the residence at the place chosen for the domicile must be actual; to the *factum* of residence there must be added *animus manendi;* and that place is. the domicile of a person in which he has voluntarily fixed his habitation, not for a mere temporary or special purpose, but with a present intention of mak-

279

Harral v. Harral.

ing it his home, unless, or until something uncertain or unexpected shall happen to induce him to adopt some other place as his permanent home.

4. By the laws of France, the marriage of a foreigner in France without any contract as to property, followed by the establishment of a conjugal domicile in that country, will subject the property of the married persons to the community law, and a government authorization under article XIII. of the Code is not necessary to the establishment of such a domicile.

5. H., whose birthplace was in Connecticut, went to Europe in 1869, for the purpose of acquiring the German language, and completing his professional studies. In 1872 he went to Paris, where he remained; and, in February, 1877, married a French woman in Paris, without any contract as to property. Immediately after the marriage he rented a house at Suresnes, a village near Paris, for two years, and took up his residence there with his wife. In May, 1878, he was brought to this country, and sent to a hospital for the insane, at Philadelphia, where he died in 1881.—*Held*, that by his marriage in France, and the establishment of his conjugal domicile there, his personal property became subject to the community law, and that his widow, on his death, was entitled to the one-half part thereof, notwithstanding that by his will, made before the marriage, he had bequeathed the whole of it to others.

---

On appeal from · decree of the chancellor, whose opinion is reported in *Harrall* v. *Wallis, 10 Stew. Eq. 458*.

Frederick F. Harral was born in Connecticut in 1842. He graduated at Yale College in 1863, and at the College of Physician and Surgeons, in New York city, in 1868. He was married on the 20th of February, 1877, before the deputy mayor, in the city of Paris, to Clarice Marie Le Gars, a French woman. In May, 1878, he returned to this country, and died at Kirkbride's hospital for the insane, in Philadelphia, July 5th, 1881.

On the 9th of July, 1869, and before his departure for Europe, the decedent duly made and executed a will, devising and bequeathing all his property, real and personal, to his brother and sisters, and appointing William Creighton Peet and Hamilton Wallis executors. This will was admitted to probate in the prerogative court of this state on the 31st of July, 1882.

The widow filed this bill in the court of chancery of this state, to which the legatees under the will of her husband and the executors are parties.

The prayer of the bill is that the personal estate of the de-

Harral v. Harral.

cedent, so far as concerns the complainant's interest therein, should be distributed in accordance with the laws of France.

On final hearing, on bill answer and depositions, the chancellor made a decree in accordance with the prayer of the bill. From that decree the defendants appealed.

Mr. Flavel McGee and Mr. J. D. Bedle, for appellants.

Mr. John Linn and Mr. F. R. Coudert, of New York, for respondents.

The opinion of the court was delivered by

DEPUE, J.

The law of France in relation to the rights of husband and wife in the property of either spouse is established by the Code Napoleon. Before the French Revolution, the northern provinces of France were under the customary law, and the community of property governed the nuptial contract; in the southern provinces the Roman law prevailed, and the contract was governed by the dotal system. The Code Napoleon left the parties to elect the law by which the marriage should be governed; and if no election was made, the community system was to prevail. 2 Kent 187, note. Section 1391 of the Code provides that the parties may declare in a general manner that they intend to marry either under the law of community or under the law of dowry. The community is either legal or conventional. Legal community is established either by a simple declaration that the parties marry under the law of community, or by a marriage without any contract on the subject. Sections 1400, 1497. There was no marriage contract between these parties with respect to property; and if disposition of the personal estate in question is to be made by the French law, it must be disposed of as community property.

Community is divided by the Code into two classes—active and passive. The former relates to the disposition of property; the latter, to liability for debts. The property which is comprised

in the community consists of (1) All the movable property which the married parties possessed on the day of the celebration of the marriage, and all movable property which falls to them during the marriage, by succession, or even by donation, if the donor has not expressed himself to the contrary; (2) All the fruits, revenues, interest and arrears of what nature soever they may be, fallen due or received during the marriage, and arising from property which belonged to the married persons at the time of the celebration of the marriage, or from such as has fallen to them during the marriage by any title whatsoever; and (3) All immovable property acquired during the marriage. Section 1401. This community, whether it be conventional or legal, commences from the day of the marriage contracted before the officer of the civil power. Section 1399. During the coverture the husband has the custody, control, management and power of disposition (under some restrictions) of the community property, (sections 1421, 1422); and he may make a testamentary disposition of his portion of the community property, but of no more. Section 1423. After the death of the husband the wife may accept or renounce the community. Section 1453. If she accept it, her share—that is, the one-half part of the community property—is given to her, subject, in the partition, to certain specified deductions and allowances by way of compensation. Sections 1467, 1480.

The complainant, in her bill, charges that the legal domicile of the decedent, at the time of his death, was in France, and insists that from the time of the celebration of her marriage with the testator, by force and operation of the laws of France, a legal community was established between her and her husband as to all the personal or movable property possessed or owned by either of them during the marriage, and in all the fruits, revenues, interest and income thereof; and that upon the death of the testator she was entitled to have and receive, absolutely, for her own use and benefit, the one-half part of all such property so held in community between herself and her husband, and that it was not in the power of her husband to dispose of that share or interest in said property, which, by the laws of France, belonged to her.

The defendants, in their answer, admit that the testator was married to the complainant on the 20th of February, 1877, at Paris; but they say that the marriage was void for the reason that the testator at that time was of non-sane mind, and incompetent to enter into a contract of marriage. They admit that the testator lived in Paris for five years before his marriage, but deny that his legal domicile was, at the time of his marriage, or at any time, in France, and insist that distribution of his personal estate should be made under the laws of New Jersey. They also say that by the law of France no man can become domiciled in France without he shall have first applied to the French government for permission to do so, and obtained an express authorization from the government to establish such domicile, and that the testator never obtained an authorization to establish his domicile in France, and never became domiciled there by the laws of that country.

The chancellor, in his opinion, considered the evidence on the subject of the testator's mental condition at the time of his marriage, and reached the conclusion that the testator was not at that time mentally incapacitated to contract marriage or to change or establish his domicile. The evidence shows that the decedent, for some time, had been addicted to intemperance, and that his physical and mental vigor had been impaired by indulgence in drink; but it falls short of proof that, at the time of his marriage, his mental faculties had become so impaired as to incapacitate him from entering into a contract of marriage, or from deciding upon the place of his domicile. The answer contains no allegation of fraud or imposition upon the decedent in procuring the marriage. The case turns wholly upon the applicability of the community law to the testator's personal estate in the hands of his executors.

When the testator went abroad in 1869, his property consisted of personal estate, and a house and lot in Bridgeport, Connecticut. The personal estate he left in charge of Mr. Wallis, to be invested and cared for, and it remained in charge of the latter during the lifetime of the decedent. This personal estate, amounting to about $50,000, at the testator's death came to the

hands of the executors. This controversy relates wholly to the personal estate.

The domicile of the testator's parents, at the time of his birth, was in Bridgeport, Connecticut. That was his domicile of origin. His father died in 1862. In 1865 the family residence in Bridgeport was sold, and in 1866 his mother removed to New York with all the family, except one son, who was married, and had his household in Bridgeport. The mother rented a house in New York as a residence for herself and the family, which they occupied until her death in December, 1867. After his mother's death, the testator resided in New York city with his brother, until he was appointed house-surgeon in the New York Hospital, and had his residence in the hospital until he went to Europe in August, 1869.

The decedent went abroad for the purpose of acquiring the German language, and continuing his professional studies. In 1869 he was in Paris temporarily, and in the fall of that year left Paris for Germany, where he remained about two years. He then went to Paris again, and resided there in No. 8 Rue de la Sarbonne, known as the Latin Quartier. In 1872, he became acquainted with the complainant, who lived with him as his mistress at No. 8 Rue de la Sarbonne, until they were married on the 20th of February, 1877. Immediately after their marriage they began housekeeping in a house rented by him at Suresnes, a village a short distance from Paris. He had a lease of the house for two years, and he and his wife continued to occupy it until his return to America, in May, 1878. He seems to have been attached to his wife. In May, 1877, he wrote to Mr. Wallis, announcing his marriage, and said he was " happy and contented." The facts connected with the residence of the decedent at Suresnes are fully stated in the opinion of the chancellor, and need not be repeated here. The chancellor, from the testimony, concluded that the decedent had settled himself in France to live there, and make it his home. The circumstances under which he was brought to America are also detailed in the chancellor's opinion. They show no intention on the part

Harral v. Harral.

of the decedent to make any change, at that time, in his domicile. The evidence is quite to the contrary.

A person *sui juris* may change his domicile as often as he pleases. To effect such a change, naturalization in the country he adopts as his domicile is not essential. He need not do all that is necessary to divest himself of his original nationality. There must be a voluntary change of residence; the residence at the place chosen for the domicile must be actual; to the *factum* of residence there must be added the *animus manendi;* and that place is the domicile of a person in which he has voluntarily fixed his habitation, not for a mere temporary or special purpose, but with a present intention of making it his home, unless or until something which is uncertain or unexpected shall happen to induce him to adopt some other permanent home. *Haldane* v. *Eckford, L. R. (8 Eq.) 631; King* v. *Foxwell, L. R. (3 Ch. Div.) 518; Lord* v. *Colvin, 5 Jur. (N. S.) 351; Aikman* v. *Aikman, 7 Id. 1017, 1019; Douglas* v. *Douglas, L. R. (12 Eq.) 617, 644; Udny* v. *Udny, L. R. (1 Sc. App.) 441; Cadwalader* v. *Howell, 3 Harr. 144, 145.*

We think the evidence proves that the testator's domicile, arising from the *factum* of residence and the *animus manendi*, was, at the time of his death, by the *jus gentium*, in France.

But it is contended that, inasmuch as the decedent never obtained an authorization from the French government, he was incapable, by the law of that country, of acquiring a domicile in France, and that therefore his domicile of origin, or his domicile before he took up his residence in France, either revived or, by the French law, would govern in the disposition of his personal estate if it was administered upon in France. Article XIII of the Code Napoleon is relied on to sustain this contention. That article is in these words:

"The foreigner who shall have been admitted by the government to establish his domicile in France, shall enjoy in that country all civil rights so long as he shall continue to reside there."

It appears from the evidence that the authorization contemplated by this article of the Code, is obtained by an application

to the head of the government, and is attended with formalities almost as solemn as those required for naturalization in France.

The construction of this article was before the English courts in *Bremer* v. *Freeman*, *10 Moore P. C. 306*, and *Hamilton* v. *Dallas*, *L. R. (1 Ch. Div.) 257*, and was somewhat considered in the New York court of appeals in *Dupuy* v. *Wurtz, 53 N. Y. 556*. In *Bremer* v. *Freeman*, it was held that, if by the *jus gentium* the decedent, who was an English woman by birth, was *de facto* domiciled in France, the authorization of the French government was not necessary to confer upon her the right of testacy, and that her will, not executed in conformity with the French law, was invalid. In *Hamilton* v. *Dallas*, Vice-Chancellor Bacon held that a *de facto* domicile, governing the succession of the personal estate of a decedent, might be acquired by a foreigner resident in that country, who had not obtained the government authorization required by article XIII of the French Code, as the condition for the enjoyment by a foreigner resident in that country of full civil rights. The learned judge who prepared the opinion in *Dupuy* v. *Wurtz*, expressed a contrary opinion, but the case did not call for a decision on that point. The counsel of the defendants have produced several decisions of the French courts, which hold that, in cases of intestacy, the inheritance of a foreigner domiciled *de facto* in France will not be distributed under the French law, unless he shall have obtained the authorization required by article XIII of the Code. *Pepin's Case, decided in 1868; Melizet's Case, decided January, 1869; Ott's Case, decided January, 1869 ; Forgo's Case, decided in 1875,* and *Ouirana's Case, decided in 1881.* It will be observed that all these cases relate to the transmission of property by inheritance, or by testamentary disposition. They do not touch the question in controversy in this case. The complainant does not claim the property in dispute by any right of succession, nor does she dispute the validity of the testator's will, as not being executed according to the laws of France. The claim she makes to the one-half of the personal property of her deceased husband, she founds upon the marriage in France, and the incidents of the married relation, in virtue of which she claims that, by the

Harral v. Harral.

French law, she became thereby *ipso facto* entitled to that share in his movable property.

The French jurists recognize a distinction between such a legal domicile as a foreigner can acquire by fulfilling the requirements of article XIII of the Code, and will entitle him to all the civil rights of native-born Frenchmen, and a domicile, in fact, which is acquired by a residence without compliance with any legal formalities. The right of a foreigner to contract a lawful marriage is not made to depend on the observance of such forms as are necessary to the acquisition of citizenship; it is given on the sole condition of six months' residence by either of the parties. Article LXXIV of the Code provides that " the marriage shall be celebrated in the commune in which the one or the other of the parties shall be domiciled," and declares that " this domicile shall be established by six months' continued habitation within the same commune." These conditions were fulfilled, and the marriage was lawfully celebrated under the French law.

The complainant's counsel contended that inasmuch as the marriage was celebrated in France, the wife, immediately on her consummation of the marriage, acquired a vested right in her husband's property, independent of any question of domicile, and that her right in the personal property of the husband was a *jus* acquired by the marriage by virtue of the French law, which could not be invalidated by any extraneous circumstances. This view has had some support in the opinions of writers on international law, but is contrary to the course of decision in the courts of this country, and, I may add, to the later decisions of the courts elsewhere. The doctrine generally adopted and supported by reason and public policy is, that a marriage celebrated according to rites and ceremonies recognized by the laws of the country where the marriage takes place, is valid everywhere; and, as a general rule (not without exceptions), by that law the capacity of the parties to contract a marriage is determined. *Whart. on Confl. of Laws* §§ *161, 162, 164; Story on Confl. of Laws* §§ *113, 113 a, 114, 123 b, 124, 124 a; Bish. on Marr. and Div.* §§ *357, 359, 363, 370; Moore* v. *Hegeman, 92 N. Y. 521.* But with respect to the property rights of husband or wife in the

personal property of either, derived from the marriage relation, the place where the marriage was celebrated is not decisive; these rights depend on what is known in law as the matrimonial domicile. *Le Breton* v. *Nouchet, 3 Mart.* (*La.*) *60, 81; Ford* v. *Ford, 2 Mart.* (*N. S.*) *574; Allen* v. *Alle , 6 Rob.* (*La.*) *104; Kneeland* v. *Ensley, Meigs* (*Tenn.*) *620; Glenn v. Glenn, 47 Ala. 204; Mason* v. *Homer, 105 Mass. 116; Story on Confl. of Laws §§ 186, 193; 2 Pars. on Cont. 590.* Mr. Wharton says that the place of the celebration is not necessarily the place of the performance of the marriage, which, he says, the later jurists have agreed is its true legal site, and that this place of performance is the matrimonial domicile to which the husband and wife propose to repair. *Whart. on Confl. of Laws § 192.* On the marriage, the legal presumption is that the wife takes the domicile of her husband, and her rights are subject to the law of his domicile; but that presumption is overcome, and the legal inference is superseded when, on the marriage, the parties adopt a place for their matrimonial domicile—in which event the matrimonial domicile will control, and will regulate the property rights of the parties in movables.

The authorities are quite generally in accord in selecting the matrimonial domicile as the place which shall furnish the law regulating the interests of husband and wife in the movable property of either, which was *in esse* when the marriage took place. Perplexing questions sometimes arise as to what place shall be deemed the true matrimonial domicile in the sense of this rule. Mr. Justice Story supposes a case where neither of the parties has a domicile in the place where the marriage was celebrated, and the parties were there *in transitu*, or during a temporary residence, or on a journey made for that sole purpose *animo revertendi*, and says that the principle maintained by foreign jurists in such cases would be that the actual or intended domicile of the parties would be deemed to be the true matrimonial domicile; or, to express the doctrine in a more general form, that the law of the place where, at the time of the marriage, the parties intended to fix their domicile would govern all the rights resulting from the marriage. He also supposes the case of a man domiciled in one state marrying a lady domiciled in another

Harral *v.* Harral.

state, and says that foreign jurists would hold that the matrimonial domicile would be the domicile of the husband if it was the intention of the parties to fix their residence there, or the domicile of the wife if it was their intention to fix their residence there, or in a different place from the domicile of either the husband or wife if they intended to establish their matrimonial domicile in some other place.    He then refers to the decisions of the courts of Louisiana, adopting the same principle, and concludes that, " under these circumstances, where there is such a general consent of foreign jurists to the doctrine thus recognized in America, it is not, perhaps, too much to affirm that a contrary doctrine will scarcely hereafter be established; for, in England as well as in America, in the interpretation of other contracts, the laws of the place where they are to be performed has been held to govern.    Treated, therefore, as a matter of tacit matrimonial contract (if it can be so treated), there is the rule of analogy to govern it; and treated as a matter to be governed by the municipal law to which the parties were, or meant to be, subjected by their future domicile, the doctrine seems equally capable of a solid vindication." *Story's Confl. of Laws* §§ *191–199.*   All perplexity on this subject is removed where, as in this case, the place where the marriage is celebrated, the domicile of the wife, and the establishment of a home after the marriage, concur. The place of contract and the place of performance being the same, on legal analogies there would seem to be no doubt that that place would be the matrimonial domicile, and that the incidents of the marriage would be determined by the law of that place.

Nor can that question, which has given rise to great diversity of opinion where new property has been acquired after the marriage, and in a new domicile, arise in this case, for the property to which this controversy relates was *in esse* at the time of the marriage, and the matrimonial domicile then established continued until the husband's death; and it is universally allowed that, when a marriage takes place without settlement, the mutual rights of the husband and wife in each other's movable property

19

Harral v. Harral.

are to be regulated by the law of the matrimonial domicile, so long as that remains unchanged. *Westlake's Int. Law* § *366.*

The French law recognizes a conjugal domicile analogous to what is known in our law as a matrimonial domicile, and is distinguished from that domicile which is required for the purpose of contracting a lawful marriage; and the law of that country, with respect to the effect of the conjugal domicile upon the rights of husband and wife in the movable property of either spouse, is in accordance with the views above expressed. George Merrell, a witness called by the defendants, who is not an attorney or *avocat* in the French courts, being a foreigner who studied law in New York city, said that a foreigner cannot acquire a domicile in France without complying with article XIII of the Code, except it be a matrimonial domicile, which he defines to be the residence necessary to confer jurisdiction on the magistrate for the celebration of the marriage; and that in the case of an American citizen establishing his residence in France, with intention of making that his permanent home, marrying and living there, not having received the government authorization, according to the Code, his personal property would be distributed according to the American law. On the other hand, M. Goiraud, a French lawyer called by the complainant, testified that the domicile necessary for a foreigner to contract a legal marriage required only a residence, in fact, for six months, and that the domicile which was to govern the marriage relations of the parties would be the conjugal domicile, which he defined to be the domicile which had been chosen by the parties, either at the time of the marriage or after the marriage, in order to be finally settled. M. Clunet, *avocat* of the court of Paris, called by the complainant, testified that French jurisprudence, in order to establish the marriage relation of the parties married without a contract, takes, as a principle, their supposed intention, and finds the expression of that intention in what is called the conjugal domicile, or, in other words, the place where, after the marriage, the parties establish themselves. Both these witnesses agree that government authorization is not required for the establishment of a conjugal domicile in France, which, when the marriage is celebrated in

France without a contract, will make the property of a foreign-
born husband subject to the community law.

The decisions of the French courts sustain the opinions given
by M. Goiraud and M. Clunet. In *Breul's Case, Sirey (1854,)*
*2–105,* translated in *4 .Phillim. Int. Law 226,* and more fully
in *Cole on Domicile 45, 47,* Breul was a Hanoverian; he mar-
ried a French woman in France, and died there; at the time of
his marriage, and at his death, he was domiciled in France, but
had not obtained a governmental authorization for that purpose.
On appeal, the question was whether there was a community of
goods between husband and wife. The court held that there was,
and that foreigners were capable of entering into all contracts
depending on the law of nations, and could, when they marry in
France, accept tacitly the rule of community, established by law,
in the same way as they might have made that rule the subject
of express stipulation in a formal contract; that, to make this
principle apply to foreigners, it was not enough that the marriage
was celebrated in France; but that it was also necessary that the
intention of the contracting parties to adopt the community should
be manifested by affirmative acts; that the establishment of a
domicile in France had always been regarded as the most positive
manifestation of such intention; that the domicile ought to have
an importance to distinguish it from simple residence, but it was
not necessary that it should have been authorized by the govern-
ment under article XIII, for the reason that the object of this
authorization was to confer on the foreigner all the civil rights
of native-born Frenchmen, and that these rights were not neces-
sary in a foreigner in order to enable him to enter into matri-
monial conventions, which are purely of the *jus gentium.*

In *Lloyd* v. *Lloyd, Sirey (1849,) 2–220;* in *Cole on Domicile*
*37,* and translated in a note to *Whicker* v. *Hume, 13 Beav. 401,*
James Lloyd, a foreigner, whose birthplace was unknown, and
who was, by presumption and residence, an Englishman, came
to France, and established himself there permanently. In 1836
he married, at Paris, a French woman, without a marriage settle-
ment. He had three children by the wife before marriage, and
three afterwards. He continued his residence, and died in Paris,

leaving his wife and the six children surviving him. The widow claimed, before the French court, that portion of the property which would belong to her by the French law, if she and her husband were married under the *régime* of the *communauté des biens*. Her right depended on whether, at the time of the marriage, the decedent had a legal domicile in France. He never had applied for or obtained an authorization under article XIII of the Code. The tribunal of the Seine decided against her claim,. but the decree was reversed by the court of appeal, and the claim of the widow sustained. The court said that " it is fruitless to contend that the domicile of James Lloyd, in France, was. not accompanied by the authorization of the government, required by article XIII, and therefore it cannot be taken into consideration as regulating the conjugal domicile, for it is a fixed principle of law, as well before as since the Code, that a foreigner, even when he preserves that quality, could acquire a domicile in France; that article XIII of the Code did not intend to change this state of things; that it is only when a foreigner wishes to possess such a domicile in France, as will confer upon him all civil rights, that the authorization of government is required; that in the present case it is not a question as to a civil right, exclusively appertaining to a French citizen; that the tacit agreement as to the community of goods, resulting from submission to articles 1393, 1399, 1340, and the succeeding articles, was purely derived from the law of nations."

In *Fraix's Case*, Fraix was a Savoyard, and settled in Paris, where he married his second wife, a French woman. The question was whether he married under the French *communauté des biens*. The court held that although he had not been authorized by the government to establish his domicile in France, a domicile was not necessary to make the *communauté* applicable, which is presumed to have been the intention of the parties when they fixed themselves in France. *4 Phillim. Int. Law 231.*

In *Ghisla's Case*, decided in 1878, Ghisla was a Swiss by birth. He married a French woman in France, and before and after his. marriage had his domicile in Marseilles, and in that place died.. His widow claimed the benefit of the community law, and it was.

Harral *v.* Harral.

adjudged to her by the court of Aix, the ground of the decision being that, where one of the married couple is French, and the other a foreigner, they are, in the absence of a contract, governed by the law of the conjugal domicile; that the intention of the parties is to be considered before their nationality, and that to the fixing of the conjugal domicile, government authorization was not required, for whatever appertains to the marriage belongs rather to the *jus gentium* than to the civil law, .properly speaking· *Jour. Int. Law 1878, 610.* In *Dages* v. *Laborde* it was held that the legislation applicable to the civil interests of a marriage, was that of the place where the married couple established their domicile immediately after the marriage, and where it appeared that it was their intention to fix the principal place of their business, and to raise their family, and that this domicile was denominated their matrimonial domicile. Court of Pau, 1835, affirmed in the court of cassation, December, 1836, *28 Annual des Palais 537.*

*Giovanetti* v. *Orsini, Sirey (1855,) 699,* is the converse of the cases cited. In that case a Frenchman, while domiciled in Tuscany, married an Italian woman in Florence. They afterwards removed to France. On her death, the question arose in France as to the matrimonial *régime* governing the estate of the deceased wife. There had been an agreement, subsequent to marriage, with respect to property, not valid under the French law. The court held that the marriage having been contracted at Florence, and the parties having, at the epoch of their marriage, fixed their matrimonial domicile in Tuscany, the marriage was necessarily under the influence of the Roman law, which governed such matters in Tuscany, according to which, agreements subsequent to marriage were authorized and valid. *Cole on Domicile 41.*

*Morand* v. *Commune de Mézère, Sirey (1873,) pt. II., 148,* much relied on by the defendants, is not in point. The parties were married in Sardinia, and then removed to France. The husband settled in Paris, and had his principal establishment there, but did not obtain authorization from the government. His daughter was born in France. He died in 1855, and his

widow in 1867, making the commune her residuary legatee. The court held that Morand was a foreigner, and so were his wife and daughter, and therefore the laws of France did not govern the succession. The effect of a French marriage, followed by a conjugal domicile in France, was in nowise involved.

I think it is clearly shown, not only by the testimony of the French lawyers who were witnesses in this case, but also by the French decisions, that it is the law of that country that the marriage of a foreigner in France, without any contract, followed by a conjugal domicile in France, will subject the property of the married persons to the community law, and that a government authorization under article XIII of the Code is not necessary to the establishment of such a domicile.

The decree of the chancellor should be affirmed.

*Decree unanimously affirmed.*