## In re BENSON'S will.

[Submitted May 18th, 1921. Decided June 23d, 1921.]

1. Where a testator left his estate to his daughter with whom he lived during the time he was from seventy-three to seventy-seven years old, instead of distributing the estate between such daughter and two other children who survived him, a presumption against the daughter of undue influence arises.

2. Evidence *held* that the will leaving the property to the daughter with whom the testator lived was not the product of undue influence by the daughter.

3. Evidence *held* to prove that the testator's domicile was within the state, notwithstanding recitals in the will and codicil that he was domiciled in another state.

4. Recitals in a will and codicil as to the testative domicile are evidential of the domicile, but may be overcome by evidence contradicting them.

On caveat against probate of will.

*Mr. Albert C. Wall* (of *Wall, Haight, Carey & Hartpence*), for the proponents.

*Mr. Samuel Heyman* (of *Heyman & Heyman*), for the caveators.

GRIFFIN, VICE-ORDINARY.

This matter comes before the court on a caveat filed against the probate of the will and codicil thereto of Colonel Frederick S. Benson, who died at Atlantic Highlands, in this state, on the 23d day of February, 1920, at the age of eighty-one years.

The will was made in 1913, when testator was seventy-three years old; and the codicil was made in 1917, when he was aged seventy-seven years. He left an estate of about $300,000. By his will he gave, in the second paragraph, $1,000 to his son, Fred S. Benson, Jr.; $1,000 to his daughter Bessie Rubens, and $5,000 to his daughter Maude E. Spear. He also gave to said three children, share and share alike, the sum of $1,500, plus

interest at the rate of six per cent., from 1868 to the time of his death, being the sum advanced to him by his deceased wife towards the purchase of a home for the family. This latter sum, with interest, amounts to approximately $6,000, being $2,000 to each. These two items, amounting to $3,000, are all that these two children, Bessie and Fred, were given under the will which passed this large estate, excepting that he gave his gold Frodsham chronometer watch, which had been his father's, to his son, Fred. To his daughter Maude he gave all of his real estate, including the cemetery lots in Greenwood cemetery, Brooklyn, New York, and Newton cemetery, Newton, Massachusetts, as he stated in the will "as an appreciation of her devoted care and love for me after the death of my wife, Charlotte E. Benson." In the sixth paragraph he gave to his executor all of his securities, including stocks, bonds and cash, subject to prior bequests, in trust to pay the net income therefrom to his daughter Maude R. Spear, during her lifetime, and after her death to pay the net income therefrom to his grandson, Frederick H. Spear, who is the son of Maude.

In the seventh paragraph he directs that after the death of Maude and her son, Fred, his trustees shall convert all his securities into cash, and that the proceeds of the securities converted, and cash, shall be divided among twenty-two religious and charitable institutions therein named; and for the purpose of this division he specified the sum that each institution should receive, and provided that if there was more or less than sufficient to pay such legacies, each legacy should be increased or diminished ratably. Of these legacies eighteen were in the sum of $5,000 each, and four in the sum of $2,500 each.

In the eighth paragraph he gave the residue of his estate, including plate, pictures, horses, carriages, harness, boats, clothing and jewelry, to his daughter Maude.

The codicil is dated the 15th day of March, 1917. By this codicil he revoked the sixth and seventh paragraphs of his will, and in the second paragraph gave to his executor, subject to the bequests in the second, third and fourth and fifth articles of the will, in trust, all of his securities, including stocks, bonds and cash, to pay the net income to his daughter Maude for life,

and after her death to divide the principal of the trust fund into as many equal separate trust funds as there shall be then surviving any of his grandchildren, Frederick H. Spear, Maude R. Benson, Warren S. Benson, George L. Fox and Gladys M. Ainslee, and to pay the income of one such fund to each such grandchild during his or her life; and, generally, by the third paragraph, after the death of Maude and the grandchildren mentioned, the principal of these trust funds he directed should pass to the charitable and religious institutions named in paragraph 7 of his will, in the proportions therein specified.

The testator, in his lifetime, was the chief engineer of the Brooklyn Union Gas Company, eastern division, and so continued down to 1907, when he resigned. In 1904 his son, Fred, went into the employ of the company under his father, and continued in this employment ever since, being superintendent of the Nassau works station of the company. The relations between the father and son were very pleasant down to the date of the death of the testator's wife, when discord arose over her will, which will be dealt with later. He seemed to be very fond of his son and took pride in his progress. Even after the death of his wife, notwithstanding the friction that had arisen, the testator frequently visited the works, made inquiries concerning his progress, and was greatly pleased with it.

Were it not for this discord, there was nothing in the life and conduct of Fred which would induce a parent to make such an unnatural and unjust will. Prior to 1911 Fred's mother had said she would will her property to him. This he expected to use in discharging the debt on his home. He had no income outside of his earnings. He was married and had two children.

Mrs. Spear became a widow in 1901, burdened with one child. Her husband left very little means, and she, in a large measure, supported herself and her child from her own earnings, part of which she received from her mother and father for services rendered. When her mother died, in 1911, she, by her will, gave her property to the daughter Maude. This so enraged Fred that he and Maude remained virtually estranged down to the date of the testator's death. I may say that there was nothing in the will of the mother which justified Fred's conduct. Her

estate was small; Mrs. Spear had very little property, and it was quite natural for the mother in such a situation to prefer her daughter, burdened with this child, rather than her son, who occupied a position with prospects of advancement.

The other daughter, Mrs. Rubens, at the time of testator's death, was a woman of wealth, and the failure of the testator to suitably recognize her in his will could in no sense suggest the idea that the will, as to her, was unjust or unnatural. Mrs. Rubens was the eldest, Mrs. Spear was next, and Fred was the youngest child. At the time he testified he was forty-four years old. Touching the attainments of the three children, it is perfectly plain that Mrs. Spear, in force of character, will power and physique, outranked the other children. She is apparently a woman of a dominant disposition, large in stature, with a pronounced military bearing, and rather inclined to boast of her mental superiority over her sister Mrs. Rubens. Fred is small in stature, lacking, I think, the mentality and diplomacy of his sister Maude, which plainly appears from his treatment of his sister and his father after his mother's death.

The origin of the quarrel, in brief, arose from the idea which entered the mind of Fred that his sister Maude had unduly influenced his mother to make this will, and he so charged; and there is some evidence of a vague and indefinite character which gives slight color to the charge.

The testator tried to compose their differences, and endeavored to restore family harmony between Maude, on the one side, and Mrs. Rubens (who sided with Fred) and Fred, on the other, but failed. Fred would not visit the home of his father because of the presence of Mrs. Spear. If the father desired to visit Fred, Mrs. Spear was not a welcome visitor with him. It was certainly a very painful and sorrowful thing for this old gentleman, not far removed from the grave, to find such discord in his family, which arose, as he expressed it, over the few thousand dollars left to Maude by the mother.

While this situation existed the will of March 28th, 1913, was drawn, giving Fred, in the aggregate, not more than $3,000. Later on, while the dislike and bad feeling exhibited by Fred towards his sister—outwardly, at least—moderated, there was

no real reconciliation between them, and there did not exist that kindly feeling or affection that should exist between brother and sister.

On March 15th, 1917, the codicil above mentioned was executed, and it is apparent that at this time the feeling of the father was still very strong against his son, Fred; but his mind turned to the equal protection of his grandchildren.

Two points are made against the probate of the will: The first goes to its validity, namely, that it was the product of undue influence exerted by Maude; and the second goes to the jurisdiction of the court, namely, that the testator was not domiciled in this state at the time of his death.

I. Touching the question of undue influence: The evidence is that Maude was of a dominant disposition and strong personality; that she and the testator lived together in the same household, from 1911 until his death; that the other children seldom came in contact with him. These facts I find to be true. But I also find that if the children had so desired, there would have been no difficulty in seeing the father. He appeared to love them, and yearned for their company; but they denied themselves to him because of their feeling against their sister Maude. There is evidence which I am inclined to believe, although denied by Maude, that she, when accused of influencing the mother in the making of the will, said she would also have her father make a will leaving everything to her.

There is a great mass of conflicting evidence in the case which I do not deem it necessary to pass upon, because the conclusion I have reached is that, in the situation presented, with this strong woman, in the prime of life, living with this old gentleman, from seventy-three to seventy-seven years of age, in complete contact, freed from the influence of the other children, the presumption of undue influence arises, and casts the burden upon the proponent to prove the negative. This, the proponent says, has been accomplished, first, by the evidence of Maude; second, that the generosity of the testator towards Maude was greatly induced by the kindness and service rendered by her to her father, which does not constitute undue influence; third, that the conduct of Fred and Mrs. Rubens so provoked the tes-

tator as to be the promoting cause of his practically ignoring them in his will; and also that the testator went unattended to his counsel, reputable lawyers in the city of Brooklyn, and gave the data from which the will was prepared, out of the presence of Maude, and the will remained in Brooklyn, unseen by Maude, until after the death of the testator; and, lastly, by the evidence of the friends and associates of the testator, and of counsel who drew the will, who testified to the strength of character and will power of the testator, from which it is quite plain that Maude, if she desired to do so, not only could not influence the testator, but really that it might be unsafe for her to try.

The testimony of Maude is that she did not in the least attempt to influence her father; that she was very anxious to have her brother and sister become friendly and visit them; and there is evidence that she made such attempts; but the caveators say that such efforts did not come from the heart, but were merely made for the purpose of leading her father to believe that she was very anxious to be friendly with her brother and sister, when, in fact, she was anxious to keep them away for the ulterior purpose of securing her father's property. I am not inclined to the view that the evidence justifies this conclusion. She wrote letters for her father, which he signed, couched in the most affectionate terms, at the same time criticising and upbraiding them for making his life miserable in his later years.

Caveators contend that it is significant that these letters sometimes were sent after the testator had seen Fred at the works in Brooklyn and had made inquiries among the persons there employed as to Fred's progress, and had expressed great pleasure at his success, and had displayed every mark of affection that a father should to a dutiful son; that he would not then speak of these family differences, but seemed to wait until he returned home, when, after writing letters showing great paternal love, he would turn to the question of the family strife, and upbraid Fred and Mrs. Rubens for breaking the family ties and making his life unhappy in his declining years. It is contended that these things show that the letters were the product of Mrs. Spear's mind and not of the testator's. There is other evidence along this line which only by inference might cause

one to conclude that Maude was poisoning the mind of the father against Fred and Mrs. Rubens, and putting him in such a frame of mind that he would disinherit them. If the testator was a man of weaker mind, these things might make one pause in determining whether the proponent had met the burden of proof. But the testimony as to the strength of will and dominant disposition of the testator is so clear and convincing that I am driven to the conclusion that, however unjust and unnatural the will may be, it was not the product of undue influence exerted by Mrs. Spear upon him. It is quite likely that the stubborn course of conduct of Fred, to the mind of the testator, was such a breach of duty and lack of that affection which the son owed to the father that the testator concluded that he had forfeited his right to participate in the distribution of his estate. *In re Brengel's Will,* 85 *N. J. Eq.* 487; *affirmed,* 85 *N. J. Eq.* 599; *In re Gleespin,* 26 *N. J. Eq.* 523 (529); *Den, d. Trumbull* v. *Gibbons,* 22 *N. J. Law* 117; *In re Eatley's Will,* 82 *N. J. Eq.* 591.

II. Was the testator domiciled in this state at the time of his death?

For a great many years he owned the Beachside Farm, at Atlantic Highlands, where he resided during the summer, spending his winter months in Brooklyn. After his wife died he lived with his daughter Maude, in her small apartment, in Brooklyn, and finally suggested to her the idea that she go to live with him at Atlantic Highlands, and to this she acceded. In January, 1916, he became ill, as I recall, with an attack of *la grippe,* and that year moved to Atlantic Highlands, where they resided continuously until the testator's death, during which period he never had a home nor resided in the city of Brooklyn. Having concluded to make his permanent residence, winter and summer, at Atlantic Highlands, he tore out the heating system (which was intended for spring, summer and fall use only) and put in a large hot-water heating plant, and other conveniences, to make the residence suitable for living therein all the year around. He registered and voted at Atlantic Highlands in 1916, 1917, 1918 and 1919, and not elsewhere. This is testified to by Mrs. Spear, and is undisputed. Mr. Byrne and

Fred Benson, on election day of 1912, while going to Deal, met the testator on the boat, who said to them, "I am going down to vote;" whereupon Mr. Byrne asked him, "Don't you vote in Brooklyn?" He said, "No, I am going to Jersey to vote," and he said, "It will help me out with my taxes; they soak a New Yorker."

This testimony plainly indicates that the domicile of the testator was in this state. Any other view would call for the conclusion that this testator—an intelligent man—deliberately intended to violate our Election law and commit a crime. *In re Paullin's Will, 109 Atl. Rep. 13; affirmed, 113 Atl. Rep. 240.*

The only evidence which is said to negative the fact of domicile in this state is that in the will he is referred to as "of the borough of Brooklyn, city of New York," and in the codicil as "of the borough of Brooklyn, city and State of New York." While these recitals are evidential of domicile, yet when it is considered that the will was drawn by his Brooklyn counsel; that all his business activities had been in Brooklyn; his bank account and safe deposit box were in Brooklyn, his mind may not have turned to the effect or materiality of such a representation. It may be that he thought it referred to his business; or that he gave no thought to it. But, certainly, his acts in abandoning his residence in Brooklyn, fixing his home in Atlantic Highlands for a permanent residence, and remaining and voting there both before and after the making of the will and codicil for a period of four years until his death, during which time he had no other place of abode, clearly overcome any inference that might be drawn from a mere recital in the will and codicil as to his place of residence.

A decree will be advised that the will and codicil be admitted to probate.