This controversy involves two appeals from two orders or decrees of the Monmouth County Orphans Court.
The first is an appeal of Harold Love, executor of the will of Mamie Michelsohn, deceased, who was the widow of testator and the caveatrix in this proceeding, from a decree of the Monmouth County Orphans Court admitting to probate the last will and testament of Solomon Michelsohn, deceased. During the course of the proceedings in the Orphans Court, the caveatrix died and this appellant was substituted as caveator.
The second is an appeal by the executors of the testator from that part of an order or decree of the Monmouth County Orphans Court awarding costs and counsel fees to proctors of the caveatrix. The two appeals have been consolidated.
In the Orphans Court objection to the probate of the will was upon two grounds: first, lack of jurisdiction in the Monmouth County Orphans Court because, as it was alleged, the testator, at the time of his death, was domiciled in the State of Florida; and second, that testatrix had executed a later will. The second ground was abandoned at the hearing before the master to whom the cause was referred. The master found that the testator was domiciled in New Jersey, and the report of his finding was confirmed by the Orphans Court. The sole question to be determined on this branch of the case is that of domicile.
The facts touching this question are as follows: Solomon Michelsohn died in Orlando, Florida, on March 9th, 1942, at the age of ninety-four. In 1896, or thereabouts, he established a home in and became a resident of the Borough of Belmar, Monmouth County, New Jersey, where he became active in business and civic affairs, and the owner of considerable property in that vicinity. His family was reared in Belmar and he was actively identified with the community until the date of his death. He was a co-founder of the Jewish synagogue of Belmar and continued as a member thereof until he died. He was not a member of any synagogue in Florida. He owned a cemetery plot located near Belmar and his body was brought from Florida and interred therein. For upwards *Page 389 
of thirty years prior to his death it had been his custom to spend a portion of the year, particularly the winter months, in Florida, and as his age advanced and his health failed the periods of his sojourn in Florida were increased until in the latter years of his life he spent more time in Florida than in New Jersey. More than twenty years ago he purchased a cottage in Orlando, Florida, where he resided during the winter months, but he disposed of it shortly before his death. Until about five or six years before his death he had been a registered voter of Belmar, but in 1936 he registered and voted in the State of Florida and applied for and received a homestead exemption of taxes. In numerous legal documents which he executed, and also in his last will and testament, he is mentioned as being "of the Borough of Belmar, County of Monmouth and State of New Jersey." There are also many legal documents executed by him in which he is referred to as residing in Orlando, Florida. In applying for his homestead tax exemption in Florida, he signed and swore to a statement that he was a bona fide resident of the State of Florida, and this statement was subsequently repeated at various times on the renewal of his application for the tax exemption. His 1939, 1940 and 1941 income tax returns were filed in Florida, and his address given therein as Orlando, Florida. The 1939 return recites that his income tax return for the previous year was filed in New Jersey. However, in that same year, 1939, he had remodeled his Belmar home, installed a new heating system therein because "there is a time coming when I am going to be too old to travel and I want a home. I am tired of moving around." (He was then over ninety years of age.)
The law of this state touching the question of domicile is well settled. A person may have several residences at the same time, but only one domicile. A domicile once established remains the
domicile until another domicile is acquired, and a new domicile cannot be acquired without an abandonment of the old. The burden of proof to establish that a change of domicile has occurred rests upon the party asserting it. In re Dorrance, 115 N.J. Eq. 268; affirmed, 116 N.J. Law 362. See, also, Cadwalader v.Howell, 18 N.J. Law 138; *Page 390 Stout v. Leonard, 37 N.J. Law 492; Harral v. Harral, 39 N.J. Eq. 279; Firth v. Firth, 50 N.J. Eq. 137; Watkinson v.Watkinson, 68 N.J. Eq. 632; Givernaud v. Variel, 86 N.J. Eq. 80; affirmed, 87 N.J. Eq. 654; Rinaldi v. Rinaldi, 94 N.J. Eq. 14; Schweitzer v. Buser, 15 N.J. Mis. R. 217; Texas v.Florida, 306 U.S. 398; The Trust Company of New Jersey v.Spalding, 125 N.J. Eq. 66.
A change of residence for a special purpose, such as taxation benefits, or a period of seasonal residence in obedience to the demands of health, does not necessarily amount to a change of domicile. Texas v. Florida, supra. Nor are one's declarations as to the place of domicile controlling where they conflict with the fact, or were prompted by a desire to avoid taxation, Ibid.
It is strongly urged on behalf of the appellant that the application for a homestead exemption and his change in his voting residence from New Jersey to Florida are conclusive here on the question of domicile, and that they irrefutably prove a change of domicile in 1936. But in this connection it must be borne in mind that the testator, although apparently a man of considerable business acumen, who had acquired a substantial competence, could neither read nor write the English language, and his change of voting residence was solely for the purpose of obtaining a homestead tax exemption on his Florida property. It is hardly likely that when he signed the application for the homestead exemption he had any accurate knowledge of its contents, or purpose, or any thought that it had any bearing upon the question of his domicile. The numerous legal documents which he signed, including the will here in controversy, in which he was described as "of Belmar, N.J.," or "of Orlando, Florida," dependent upon the scrivener's own idea, support this inference. While such recitals are evidential, they are not by any means controlling. In re Benson's Will, 92 N.J. Eq. 618. And in this controversy they are of little value. There are as many on one side of the question as on the other.
The testator had a "special purpose" (Harral v. Harral,supra) for registering and voting in Florida, viz., a homestead tax exemption. But at the time of his death that special *Page 391 
purpose had ceased to exist and he no longer had any "homestead" property or any physical ties in that state. He had then sold his Florida property, and it is highly significant that in that sale he also disposed of all of its furnishings.
It is conceded that from 1896 to 1936 the testator was not only a resident of, but was domiciled in New Jersey. Unless he abandoned that domicile when he changed his voting residence in 1936 or thereafter, it was still his domicile at the time of his death. The evidence is overwhelming to the effect that there was never any abandonment of his original domicile. He never went to Florida except with the intention of returning to New Jersey at the springtime. There was always the "animus revertendi." All of his business and property interests, with the exception of his Florida residence, were in New Jersey; and his Florida property was disposed of before his death. His religious ties and associations were almost exclusively in New Jersey. It is undisputed that during the last two or three years of his life he went to Florida in the winter time only upon the insistence of his physician and his son who told him that he would not be able to withstand the rigors of the northern winters, and would probably not live through the winter months, if he did not go.
In Trust Company of New Jersey v. Spalding, supra, Vice-Chancellor Fielder, speaking of the decedent, who was over seventy-five years of age at the time of her death, said:
"At her age, it would be difficult, if not impossible, for her to make up her mind to sever ties and associations with old friends and with the place she had called home for so many years and start life anew amongst strangers."
That language is pertinent here in view of the fact that at the time the testator was alleged to have changed his domicile he was nearly ninety years of age.
The terms "animus manendi" and "animus revertendi," as frequently used in text books and judicial pronouncements, are often more confusing than illuminative. The intent, when discoverable, is merely evidential of the fact sought to be established. Circumstances may establish the intent, but to effectuate a change of domicile the intent must be coupled with the fact of actual abandonment since "a person can have *Page 392 
but one domicile at any given time." In re Dorrance, supra.
There is no persuasive evidence here of abandonment of the old domicile concededly established more than forty-five years prior to testator's death.
My conclusion is that the testator's domicile for more than forty-five years immediately prior to his death was in New Jersey; that he never abandoned that domicile, and that at the time of his death he was domiciled in this state.
One other question in connection with the first appeal should be disposed of.
Pursuant to an order of the Orphans Court testimony de beneesse was taken in Florida on August 5th, 1942. Prior to that date counsel for the caveatrix had obtained a series of exparte affidavits from witnesses who were later examined de beneesse. Counsel for proponents did not attend this examination or participate therein. When these witnesses were thus examined each was shown the affidavit previously executed by him or her and asked, "Are the statements contained in the annexed affidavit true?" The answer in each instance was "yes." The interrogatories and the answers thereto with the ex parte affidavits attached were offered in evidence before the master to whom this matter was referred by the Monmouth County Orphans Court. Objection was made to the inclusion of the affidavits in the interrogatories and their admission in evidence, and a motion was made to strike them from the record. The objection was overruled and the motion denied. In Glacken v. Glacken, 132 N.J. Eq. 304, it was held by our court of last resort that "It is not possible, under our practice, to determine a contested issue of domicile on exparte proof." The rule there laid down cannot be thus circumvented. These ex parte affidavits, although of little evidential value, should have been excluded by the master.
The second appeal is from that portion of the decree of the Monmouth County Orphans Court allowing counsel fees of $1,500, and expense money in the amount of $366.03 to proctors for the caveatrix and directing payment out of funds of the decedent's estate.
In Burr v. Burr, 53 N.J. Eq. 627, it was held that *Page 393 
"Where in a cause respecting the probate of a will, the validity of the will is not questioned, but probate is resisted on other grounds, and probate is granted, the costs and expenses of the litigation cannot be charged upon the testator's estate."
But counsel for caveator, in resisting this appeal, relies uponR.S. 2:31-86, which reads as follows:
"The Orphans' Court shall adjudge and direct which party shall pay the costs and expenses of causes litigated in the court, and may apportion the same between the parties."
This is but a restatement of section 196 of the Orphans Court Act of 1898 (P.L. 1898 ch. 234 ¶ 196 p. 788; Comp. Stat. p.3884). He also relies on R.S. 2:39-132 and Orphans Court rule 75. Neither of these statutes, nor the rule referred to, is at all pertinent to this controversy — the issue here is solely jurisdictional.
Counsel for the proponent and executor relies on R.S. 3:2-51, which reads as follows:
"In causes respecting the probate of a will or of a codicil of a will, if probate be refused, the court may order the costs and expenses of the litigation to be paid by the proponent of the will or codicil or out of the estate of the decedent. If probate be granted, the court shall order the contestant to pay the costs and expenses, unless it shall appear to the court that the contestant had reasonable cause for contesting the validity of the will or codicil, or shall not have offered at the trial or hearing any evidence other than the subscribing witnesses to the will or codicil. If it shall appear to the court that the contestant had reasonable cause for contesting the validity thereof the court may order that the costs and expenses of the litigation, both of the proponent and the contestant, be paid out of the estate of the decedent."
In Burr v. Burr, supra, Chancellor McGill, sitting as Ordinary, and referring to the statute then in force, from whichR.S. 3:2-51 was copied, said (at p. 630):
"The statute is but an emphatic declaration of the previously existing law upon the subject of such costs and expense, save in the particular that it renders obligatory upon the court, in case of the grant of probate, to order the contestant to pay the costs and expense of the litigation, unless he shall *Page 394 
show reasonable grounds for disputing the validity of the will or shall have confined his contest to the testimony of the subscribing witnesses. Perrine v. Applegate, 1 McC. 531. It isto be observed that the saving clause relating to reasonablecause, is limited to contests where the validity of the will isdrawn in question. It does not apply where the issue is made asto the court's jurisdiction, which does not deny the validity ofthe instrument." (Italics mine.)
In re Queen, 82 N.J. Eq. 588, cited by counsel for the caveator, is not contra. For a full understanding of that case the report of the preceding companion case, on page 583 of the same volume, should be read. Neither reported decision has any application to the instant case.
Burr v. Burr, supra, was decided in 1895. The statute law respecting costs and expenses in will contests was the same then as it is to-day except for slight changes in verbiage. I considerBurr v. Burr as controlling on this issue.
I shall advise a decree affirming the decree of the Monmouth County Orphans Court admitting the will of Solomon Michelsohn to probate, and reversing so much of the decree of June 28th, 1943, as awarded costs and counsel fees to proctor for the caveatrix. *Page 395