For forty-five years continuously Minnie T. Runyon resided in Jersey City. She was married in that city, owned and occupied a house there for forty years before she conveyed it to the mortgagee September 20th, 1935, continued to occupy it for several months thereafter and until she went to live with friends in Jersey City. She sold most of her furniture and packed clothing and personal belongings in two or three trunks, which she sent to a railroad storage room in Jersey City. There can be no doubt that up to November 6th, 1936, she had long been a resident of and had her domicile in that city. On the last mentioned date she left Jersey City by train for California and after making some stops on the way, arrived at San Jose, Santa Clara county, California, where she lived until her death April 27th, 1937. Letters of administration on her estate were granted May 10th, 1937, to C.C. Spalding (or Spaulding) by the superior court of Santa Clara *Page 68 
county, which court adjudged that she died a resident of that county. June 21st, 1937, the surrogate of Hudson county in this state granted letters of administration to Herman W. Klausner, adjudging that deceased was, at her death, a resident of Jersey City in said county. No appeal was taken from either grant of administration.
For many years prior to her death deceased had savings accounts in two banks in Jersey City. In the Trust Company of New Jersey she had $7,387.73 and in Provident Institution for Savings she had $4,188.68 when she died. Each administrator made claim to those funds and the State of New Jersey asserted a lien thereon for transfer inheritance taxes, whereupon the banks filed bills of interpleader and obtained orders allowing them to pay the respective deposits into court and directing all claimants to interplead therefor. Statements of claim were filed and the claimants having stipulated that the suits should be heard together, proofs were taken on the opposing claims.
The claim of the California administrator is based on the earlier grant of administration to him. Under the United States Constitution it is required that full faith and credit be given in each state to the judicial proceedings of every other state, but a judgment or decree of a court of a sister state has merely the force of evidence in this state and cannot be enforced here or affect property in this state without a new suit in our courts on the judgment or decree. Bullock v. Bullock, 51 N.J. Eq. 444;affirmed, 52 N.J. Eq. 561; Bennett v. Bennett, 63 N.J. Eq. 306.
Such a decree is not binding on our courts if the foreign court was without jurisdiction to render it. In re Dorrance,115 N.J. Eq. 268; Same Case, 116 N.J. Law 362); nor is it resjudicata against parties who were not brought within the jurisdiction of the foreign court. The order or decree of the California court is open to attack by the next of kin of the deceased and by New Jersey creditors (all represented here by the New Jersey administrator) and by the State of New Jersey, none of whom were parties to the California proceedings, on the ground that the deceased was not domiciled in California and the superior court of Santa Clara county was therefore *Page 69 
without jurisdiction to grant administration on her estate.Romanchick v. Howard Savings Institution, 118 N.J. Law 606;Thormann v. Frame, 176 U.S. 350; Baker v. Baker, Eccles Co., 242 U.S. 394.
Mrs. Runyon was about seventy-five years of age. She was eccentric and apparently given to much talk about everything except her financial affairs, concerning which she led those with whom she had contact to believe she had little or no money. She was married in Jersey City in 1892 and thereafter made trips to California with her husband. He deserted her in Jersey City and went to California with another woman and in or about 1928 Mrs. Runyon went to San Jose and retained a lawyer there who brought suit against her husband for divorce or maintenance, and she remained in San Jose for a year at that time. Her husband died in California in 1933 but Mrs. Runyon did not learn of his death until a year or so later and then she wrote her San Jose attorney requesting him to ascertain whether her husband had left any property and he replied, after investigation, that he could find none. She was not satisfied with that report and left for California November 6th, 1936, purchasing a one-way ticket and taking her trunks with her, with the avowed purpose of looking up the woman with whom her husband had eloped and who she believed still resided in California, to learn whether the woman had any of her husband's property. That such was her purpose is proven by the testimony of two of her Jersey City friends and of her San Jose attorney. She had written a letter to that lawyer, dated March 6th, 1935, concerning her husband's affairs and wherein she said: "* * * California has its drawbacks. I may lose my home. * * * I'd like to end my days in California. I got tired of the cold and snow this winter and I am so lonely." But she did not go to California until twenty months later and when she arrived at her attorney's office in November, 1936, he asked her why she came to San Jose. She did not give cold or snow or loneliness as the reason, nor did she say she had come to stay; she said what she had told her friends back home, namely that she believed the other woman had property belonging to her husband and she had come to find *Page 70 
out about it. She made social visits thereafter to her lawyer's office and talked with his son who was associated with him in law practice. The son testified that she told him that her life in Jersey City had turned out badly and she had lost everything; that she inquired what he had ascertained concerning her husband's property; that she liked California and would like to live near San Jose, but did not like California people; that she did not discuss her domicile in California or New Jersey and that he did not ask her if she was changing her residence to California.
The testimony of those two witnesses, as well as of seven other witnesses, was taken by commission in California and such testimony shows that when Mrs. Runyon arrived in San Jose she went to live at the San Jose Hotel and left after a few months' stay there because of some trouble with the proprietor, and moved to the St. James Hotel where she remained until she died. Both hotels catered to permanent and transient guests but unfortunately there is no testimony as to what Mrs. Runyon said as to the length of her stay, when she engaged her room at those hotels and the hotel registers were not produced to show from what place of residence she had registered. Of said seven witnesses, one was the proprietor of the San Jose Hotel and the others were employes there, or at the St. James Hotel. From the testimony of six of them it appears that in casual conversations Mrs. Runyon said she liked California climate and had come to live there for the rest of her life and wanted to be buried there.
The question of domicile is one of intention and statements and declarations made by one whose domicile is in dispute are entitled to consideration, but are not to be taken as conclusive. Where a domicile in a certain place is established, the intention to abandon it and establish it at another place must appear clearly and the burden of proving the change is on the one alleging it. Givernaud v. Variel, 86 N.J. Eq. 80; affirmed,87 N.J. Eq. 654; In re Dorrance, supra.
When Mrs. Runyon left for California she withdrew $550 from one of her savings accounts and she told the teller at that bank that she was going to California for a visit. She said nothing to him about transacting business with the bank *Page 71 
while she was away and did not speak of closing her account. She took her passbooks with her. Of course, she might have had other money in hand beside the amount withdrawn from the bank but that seems doubtful because she represented to her Jersey City friends that she had no money and accepted small sums from them for admission to moving picture theatres. She had to pay for railroad transportation and $40 for charges on her trunks and for board and lodging while in California and she made no subsequent bank withdrawals. That she withdrew a comparatively small sum from her bank account to cover such expenses, would indicate that she had not contemplated an extended stay in California.
Two friends who had known Mrs. Runyon for years in Jersey City testified at the hearing before me. Their testimony is criticised because they are charged with having an interest in the cause, as creditors who filed claims with the New Jersey administrator, but I regard their testimony concerning their relations, conversations and correspondence with Mrs. Runyon as entirely credible. They testified that before Mrs. Runyon left for California she discussed the proposed trip with them and said she was going to look up the other woman and was coming back to Jersey City to live; that she left with them some furniture, pictures, a bed and bedding with the request that those articles be kept for her against her return. She had discussed with those friends the thought of entering an "old ladies' home" in Jersey City and had told them she expected that was where she would end her days. In a letter written from California she said she had not accomplished the object of her trip and was sorry she had gone and was lonely. From the time she arrived in San Jose until two weeks before she died, she wrote several letters and postcards to one of the witnesses, containing complaints of California climate, the food and the people, stating that she was very lonely and making friendly inquiry about many persons living in or about Jersey City. In none of those writings did she speak of remaining in California or returning to Jersey City.
From the evidence, I can picture Mrs. Runyon as a person who, in conversation with those with whom she came in contact *Page 72 
in San Jose, would be polite and gracious in expressing admiration for all things Californian, while at the same time writing her eastern friends in criticism of the very things she praised locally. I can believe that at times she toyed with the idea of remaining in California and that she spoke of that idea to hotel employes who happened to be about when she was in the mood, but it is to be noted that she made no statement of intention to become a citizen of California to her lawyers, the most natural persons with whom to discuss such intention. She had always returned from previous trips to California and on one visit there she had remained over a year. Because of her long residence in Jersey City she must have had friends in that city, and her letters so show. She had relatives in the east and middle west and she had neither friend nor relative in California. At her age it would be difficult, if not impossible, for her to make up her mind to sever ties and associations with old friends and with the place she had called home for so many years and start life anew among strangers. That she had not determined to make the break (if she was considering it) is, I think, the reason she did not say anything definite on the subject to her lawyers or in letters to her Jersey City friends. I think it also the reason she continued to maintain her bank accounts in Jersey City, for if she had definitely decided to become a resident of California, I believe she would have transferred her funds to that state so as to have money readily available for support, medical expenses and the like.
Taking all the evidence into consideration and the inferences fairly to be drawn therefrom, I conclude that the proofs fail to show that Mrs. Runyon had changed her domicile from this state to California and I hold that she was domiciled in New Jersey at the time of her death and that the California court was without jurisdiction to appoint an administrator to administer personal property in this state of which she died possessed. The New Jersey administrator is entitled to receive and administer the fund in court, on which fund a transfer inheritance tax is due the State of New Jersey, and I shall advise a decree accordingly. *Page 73