20 N.J. Super. 162 (1952)
89 A.2d 293
IN THE MATTER OF THE ESTATE OF JAMES M. HARRISON, DECEASED.
Superior Court of New Jersey, Hudson County Court Probate Division.
Decided May 29, 1952.
*164 Messrs. Hopkins, Vorburger & Dickson, attorneys for Gertrude Atkins Harrison, executrix.
Mr. August W. Heckman, attorney for James M. Harrison and Helen M. Carrell (Mr. Abraham J. Slurzberg, of counsel).
DREWEN, J.C.C.
This is an order to show cause why the probate of decedent's will by the Surrogate of Hudson County should not be vacated and set aside. The question raised is the single one of domicile.
On September 18, 1950, decedent and his wife came to reside as registered guests at the Hotel Plaza in Jersey City; and they were still resident there when, on November 17, 1950, decedent died. His will had been executed on November 9, 1950. The ruling depends on whether the hotel residence had the character of domicile.
Decedent's coming to reside in Jersey City was the culmination of a series of facts and circumstances that are of first importance to the question, and must, therefore, be reviewed.
It begins in the year 1929, while decedent was living in Cleveland, Ohio, where he had been resident, and apparently domiciled, continuously since 1922. In May, 1929, coincidental with his retirement from business, he established separate trusts for his wife and for each of his two children. *165 The Hudson Trust Company of Hoboken was named as trustee. Part of decedent's securities were transferred to these trusts and the remainder deposited in a custodial account in his name in the trustee bank. At the same time he opened a checking account there for himself and his wife. In October, 1929, the couple vacated their Cleveland apartment and began a course of traveling from place to place at comparatively brief intervals which continued until 1934. During this period of five years they spent time in New York City, Washington, D.C., Detroit, Cleveland, and at a number of resorts. It is apparent from a variety of things, as will be shown, that during these years of itinerance they had no established domicile. But in May, 1934, decedent purchased a home in Westport, N.Y., where he and his wife resided until 1941. From time to time they journeyed away from the Westport residence to other parts of the country, always to return there, until the Westport home was sold in June, 1941. While residing at Westport decedent filed a New York State income tax return as a New York resident, and he filed his federal income tax return with the Collector of Internal Revenue at Albany. The furniture that had been in use in the Westport home was disposed of when the house was sold, and also some of the furnishings. The furnishings not sold were shipped to the home of decedent's daughter in Michigan. With the sale of the Westport property there ended all indicia of domicile at that place.
In the same month (on June 26, 1941) decedent wrote to the Hudson Trust Company from the Commodore Hotel in Cleveland: "Please send all mail to the above address until further notice," and on August 12th of that year he wrote to the bank in Hoboken acknowledging certain information respecting personal property taxes in New Jersey, and adding: "We will be drifting east along about the 1st of September and will find some spot for so-called permanent address." From this I take it that no idea of permanence attached to the situation surrounding the couple's mode of living at the time.
*166 The winter of 1941-2 was spent in a furnished hotel in Florida; the summer of 1942 was spent in Detroit. In September of 1942 the couple took up residence in the Hotel Statler in Buffalo, N.Y. In March, 1943, they returned to the Hotel Commodore in Cleveland, and in the same month decedent wrote from there to the bank in Hoboken: "For your information my official address (Federal Tax, etc.) is 56 Oakdale Blvd., Pleasant Ridge, Mich." This was the address of his daughter and it was given as decedent's own address in each of his federal income tax returns for the years 1943 to 1948, inclusive. During the winter of 1943-4, the couple again occupied a furnished apartment in Florida. From and after June, 1944, they resided for one year in Washington, D.C., leaving there for the Mayo Clinic in Rochester, Minn., because of the wife's having suffered a stroke. The winter of 1945-6 was spent at a hotel in Florida, after which the couple stayed for a short time at a hotel in Syracuse, N.Y. Following this they resided at a hotel in Atlantic City, remaining there through the winter of 1946-7. Then followed periods of residence at hotels in Washington, D.C., and Florida. Approximately the first half of 1948 was spent at hotels in Atlantic City and New York City, the couple moving to the Hotel Carter in Cleveland on August 1 of that year.
At or about this time the Westport furnishings were taken from the daughter's home in Michigan and placed in storage in Detroit. The widow testifies that this was in contemplation of trans-shipping them to California where they thought they might settle. After a month at a Chicago hotel they moved, in November, 1948, to the Hotel Hilton at Albuquerque, N.M., going from there to California, where they arrived at the end of November, 1948. On November 22, 1948, decedent wrote the bank in Hoboken that he was changing his address from that of his daughter to that of the bank in Hoboken, and that "* * * for Sheriffs and F.B.I. our address is H.T. Co.," the meaning of which I take to be that the bank was to be his address for all tax and financial *167 purposes, though, as we shall see, he used it on at least two occasions for hotel registration, one other than its use at the Plaza here. The prospect of the home in California did not materialize, apparently because of the wife's becoming ill there, and in June, 1949, they were at a hotel in Minneapolis, Minn. Under date of April 11, 1949, the bank received from decedent the following message: "I sent my first quarterly Income Tax payment to Newark and gave my address care of H.T.C., Hoboken, N.J. Am using your address re financial matters until we get `put' somewhere."
From August, 1949, to March, 1950, the couple stayed at hotels in Chicago. From there they left on separate visiting trips, she to relatives and he to his birthplace in Wisconsin. They met again in Cleveland where they engaged hotel accommodations. On September 6, 1950, they arrived at the Hotel Commodore in New York, giving their address for the registry as 51 Newark Street, Hoboken, N.J., the address of decedent's bank; and on September 18, 1950, they took up residence at the Hotel Plaza in Jersey City, where, as already stated, they were still residing at the time of decedent's death.
It is my judgment that the body of proof, by many of its details and also by its total import, shows unmistakably the domiciliary character of the hotel residence in Jersey City, both with respect to its purpose and its intended permanence. To begin with, symptoms of an end to the undomiciled status have already been seen in decedent's looking forward to "some spot for a so-called permanent address," and to their getting "`put' somewhere." The widow testified that he had told her "quite a number of times, we should find a permanent place to live"; and that "it is time we stopped this going hither and yon and settled down. We are getting too old for that." And she states that he spoke of liking New Jersey and of its being "accessible to every spot," and of its "being as good a spot as any for us to end our last days in." The first conversation of this kind occurred during the California visit, in Los Angeles. The subject was discussed by them *168 again in Chicago and in Cleveland, and the widow states that "he finally decided that New Jersey was the best place to be because all his business was here, all his securities were here, and we were adjacent to the bank and he could get in touch with them at a moment's notice"; and also that "After we got to the Plaza (in Jersey City) and changed to Suite 407 he said he liked it there * * * and he thought it suited our purpose as well as anything else we could find."
Some time after their arrival at the hotel in Jersey City they arranged with the management for their intended absence during the coming winter vacation in Florida. They arranged particularly for specified room accommodations upon their return. This testimony of the widow is corroborated by the hotel's assistant manager; and the widow says that this was the first and only time they had ever previously arranged for a return from the Florida vacation to the place they had left. South Orange, East Orange, Montclair and other New Jersey localities were, as shown by the proofs, considered in their turn as places of permanent residence but none of them chosen.
The witness Mrs. Jones had been a friend of the Harrisons for more than 30 years, and she gave testimony of a conversation with decedent in Cleveland during 1950. She detailed the conversation at length, and from her testimony it clearly appears that decedent was much concerned with settling down. He was worried about his wife's health. He told Mrs. Jones that a little house would be desirable, except that he feared his wife's over-anxiety as a housekeeper would wear out both of them. He spoke of hotel living as being "all right" if it were in a small hotel; and he referred repeatedly to New Jersey. The witness asked him why he was especially interested in New Jersey and he gave her reasons, which she repeats. He finally told her he intended to settle down, somewhere in New Jersey near the bank. To the same effect and equally definite is the testimony of conversations had with decedent by the trust company's president, its trust officer and its counsel, save that what these witnesses *169 say includes specific discussion of the Plaza Hotel in Jersey City as the place of permanent residence.
It is notable that the problem here differs substantially from the usual one of its kind. Ordinarily it is a more or less clearly established domicile that is sought to be avoided, in favor of one claimed elsewhere, and which it is the suitor's purpose in the case to have recognized as such. But here we are concerned with no competing situs; and no interest or motive on decedent's part is involved. So striking is the absence of conflicting indicia that it becomes entirely pertinent to ask where, if not in Jersey City, the domicile could have been. The perennial use, for tax return purposes, of addresses not his own is persuasive enough; but the couple's registering at a hotel from the address of the bank points an extremity, in my opinion. One instance of this sort is all we happen to know of,  in addition to that of the hotel in Jersey City  but considering the necessities of their situation, it is fair to assume that for hotel registration they had repeatedly used addresses of convenience. It becomes all too plain they had no other. Decedent, moreover, had no affiliations, civic, social or church. He did not vote. And he seems sedulously to have avoided spending any time at the home of either of his children. The one apparent ligature to locale was his bank, the custodian of his wealth. When decedent and his wife arrived at the hotel in Jersey City the way was entirely clear for the creation of domicile wherever its signs should appear. The principle here indicated is recognized in the Massachusetts case of Winans v. Winans, 205 Mass. 388, 91 N.E. 394, 395, 28 L.R.A., N.S., 992 (Mass. 1910), where it is said: "Under such circumstances the acquisition of a new domicile or a change of domicile will be much more easily and readily inferred than when one has a fixed place of abode and a family and an established business, and associations more or less deeply rooted and permanent." This view is made no less applicable by the fact it was expressed in a divorce suit.
*170 I think the case for the Jersey City domicile is also impressive on the humanistic side, apart from the more specific evidential factors. This aging, ailing couple had for 14 years, since the passing of the Westport home, been making long journeys from place to place seeking health, medical treatment, climate or the temporary relief of restlessness and boredom that is sought in mere change  but nowhere was it home. It is not at all surprising that the longing for repose came when it did. The husband was in his seventy-eighth year and suffering from the ailment that a few months later was to cause his death. The wife too had been seriously ill. That the husband had pondered their situation the testimony of Mrs. Jones, to mention no others, leaves no doubt whatever. And he had reached a final resolve  a home, either in a house of his own, or in a small hotel. So clear, indeed, is this aspect of the matter to me that all argument to disparage the claim of domicile in the Jersey City residence has the appearance of insisting on the preternatural.
It is elementary that problems of domicile are sui generis. A standard definition is given in Harral v. Harral, 39 N.J. Eq. 279, 285 (E. & A. 1884): "* * * That place is the domicile of a person in which he has voluntarily fixed his habitation, not for a mere temporary or special purpose, but with a present intention of making it his home, unless or until something which is uncertain or unexpected shall happen to induce him to adopt some other permanent home."
The cases cited against the effectiveness of decedent's declarations of intent respecting his hotel residence in Jersey City I find to be factually not in point; but these cases do recognize the probative competence of such declarations: Firth v. Firth, 50 N.J. Eq. 137 (Ch. 1892); Trust Co. of N.J. v. Spalding, 125 N.J. Eq. 66 (Ch. 1939); In re Michaelsohn, 136 N.J. Eq. 387 (Prerog. 1944). Contestants make a point of res gestae respecting the declarations and their consonance with the happenings to which they relate. But the present decision cannot be aided by a misapplication *171 of the res gestae rule. The conduct to be here adjudged is no isolated deed, but rather a pattern of intent and action toward a defined result. Creation or change of domicile, usually if not always, is a matter of maturing purpose finally carried out. In the present instance I find it to have been indubitably just that. Since this is the nature of the subject, and in view of what contestants urge, it must be asked whether the period of res gestae is to be measured by the full course of such development or by some particular phase or feature of it, and if so, which one? But in my view the question presents no difficulty. There is what I believe to be a composite of clear and cogent authority for the holding that in a situation of the kind before us the disputed declarations are admissible as substantive and original proof of the mental elements of domicile; which is to say that they are admissible on broader and more realistic ground than under the rule of res gestae. See Schloss v. Trounstine, 135 N.J.L. 11, at p. 13-15 and authorities cited.
There are also New Jersey decisions in which our courts have approved the admission of testimony of a decedent's declarations respecting his intention, made while he was actually residing at the domicile in question, and others occurring a reasonable time prior thereto. In re Dorrance, 115 N.J. Eq. 268 (Prerog. 1934); Trust Co. of N.J. v. Spalding, 125 N.J. Eq. 66 (Ch. 1939); Title Guarantee, etc., Co. v. Isherwood, 2 N.J. Misc. 342 (Sup. Ct. 1924); Cromwell v. Neeld, 15 N.J. Super. 296 (App. Div. 1951).
In 9 R.C.L., Domicile, sec. 21, we read:
"In actions involving the question as to domicile it is evident that the general rules of evidence apply. When one has changed his place of abode, and the question arises whether he intended to change his domicile, all his acts and conduct which fairly indicate his purpose in that particular, within a reasonable time before and after the event, may be put in evidence. This is evidence of intention, and as such is competent, although it may not be part of the res gestae."
*172 And further (Ibid. sec. 23):
"Declarations of a person accompanying a change of abiding place have always been held competent to explain the change as part of the res gestae, but declarations in such cases are often admissible on a broader ground than as a part of the act of removing from one place to another. The intention of the person removing is competent to be proved as an independent fact, and anything which tends to show his intention in making the change may be introduced, if it be free from objection in other particulars. In this connection it has been held that the declarations of the party himself, where he can have no object or inducement to deceive those to whom such declarations are made, are the best evidence of his intention to make his actual residence his permanent residence also."
I find and adjudge, for the reasons stated, that at the time of his death decedent was domiciled in Jersey City. Accordingly, the order to show cause is dismissed.