MEREDITH H. O'HARA, EXECUTOR OF THE ESTATE OF MARY L. JOHNSTON, DECEASED, APPELLANT v. SIDNEY GLASER, ACTING DIRECTOR, DIVISION OF TAXATION, DEPARTMENT OF THE TREASURY, STATE OF NEW JERSEY, RESPONDENT.

Argued January 10, 1972—Decided March 6, 1972.

*Mr. William D. Peek* argued the cause for appellant (*Messrs. Nichols, Thomson & Peek,* attorneys).

*Mr. Herbert K. Glickman,* Deputy Attorney General, argued the cause for respondent (*Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

*Mr. Robert L. Shevin,* Attorney General of Florida, submitted a brief *amicus curiae* (*Winifred L. Wentworth,* Assistant Attorney General, on the brief).

The opinion of the Court was delivered by

FRANCIS, J. Mary L. Johnston, an 86 year old spinster, died on July 14, 1969 in Miami, Florida, leaving an estate valued at $667,000, consisting almost entirely of bank accounts and securities. Based on a finding that Miss Johnston was a domiciliary of New Jersey at the time of her death, the Transfer Inheritance Tax Bureau declared that her estate was subject to tax under the transfer inheritance tax act. *N. J. S. A.* 54:34–1, subd. a. A substantial assessment fol-

lowed from which the executor appealed to the Appellate Divison. The Appellate Division affirmed in an unreported opinion and this Court granted certification. 60 *N. J.* 193 (1971).

Miss Johnston was born in Malden, Massachusetts, and lived there for many years. In 1921 she purchased a two-family house in Westfield, New Jersey, and moved there with her parents; she was their only child. According to the depositions in the appendix, she came to Westfield to be near her first cousin, Mrs. Pearl O'Hara, to whom she had been very close since childhood. This first cousin was the mother of Meredith O'Hara, the executor, Gordon O'Hara and Clarice J. (O'Hara) Warner, who are the principal beneficiaries under Miss Johnston's will. These children grew up considering her their Aunt, and she was a second mother to them after their parents died. The close relationship continued until her death.

Commencing in 1921 Miss Johnston became employed as an accountant and bookkeeper for the family estate of a member of the New York bar. Apparently, she acquired expertise in tax matters, particularly inheritance tax, and in securities, and she was described as being in "tax work most of her life." It seems likely that her substantial assets, about which she seems to have been quite secretive, resulted from that expertise. After her retirement in 1948, her employer sent her a gratuitous monthly payment in lieu of pension, which was continued until she died.

After Miss Johnston's parents died she lived alone on the second floor of the two-family Westfield home. For many years she had rented the first floor apartment to personal friends whom she remembered in her will with a small legacy. Both before and after she left for Florida on May 4, 1969 she offered to sell them the house, but upon consideration they decided against the purchase. In the intervening years between 1921 and 1968 the O'Hara children remained in close contact with Miss Johnston. After Meredith's marriage she became fond of his wife and children. She assisted

him in the handling of his father's estate, and when she was hospitalized in 1967 for a cataract operation, Meredith's wife took her to the hospital and looked after her when she returned home. In 1968 Meredith and Gordon O'Hara and their families moved to Florida permanently. Knowing that she was alone they suggested that she come there also. She had spent a number of enjoyable vacations in Florida and had spoken of living there to a number of persons, including Meredith and Mrs. Haney, her first floor tenant.

Matters came to a head on March 15, 1969 when, following a fall at home, probably resulting from a fainting spell, she was taken to the Rahway Hospital. She was suffering from an ankle injury and generalized arteriosclerosis which made her mentally confused at times, and likewise produced some impairment of her legs. During the hospital stay, which lasted until March 27, Dr. Dean Gray, who took care of her, said she was generally mentally alert, a very demanding and self-reliant type person, and reclusive in nature. She had some lapses of recent memory, occasional forgetfulness, and nocturnal confusion common to an 85 year old person; but he considered her mentally competent. The doctor persuaded her to transfer to the Ashbrook Nursing Home in Scotch Plains until she recovered from her leg condition.

Dr. Gray saw her a number of times at the nursing home, and discussed the future with her. Meredith O'Hara and his sister also visited her there early in April and engaged in similar conversations. It was obvious that she could not continue to live alone in her second floor apartment. According to the doctor she decided to go to Florida to live where she would be near her only close relatives. He said she was a strong-minded woman, who demanded and received the Wall Street Journal daily, and took a keen interest in her investments, although she never disclosed the value of them; she made her own decisions, and when she concluded she did not want to live alone in Westfield any longer, it was his opinion that she intended to remain in Florida permanently. When her decision was reached, O'Hara and his wife

with the aid of Dr. John A. Broward, a Florida physician, made arrangements for her admission to a nursing home in that State.

While at the New Jersey nursing home Miss Johnston decided to have a will drawn and the services of a Westfield attorney were retained for the purpose. The will was drawn, reciting her Westfield address, and presented to her on May 3, 1969. Apparently she signed it on that day but after writing amendments in the margins. As a result it had to be retyped and, because she left for Florida the next day, it was sent to her there for re-execution. On May 3 she went to her house with Meredith and packed up her clothes, records, correspondence, family photographs, Christmas card lists and jewelry to take to Florida with her. She removed everything except the furniture, which was of little value (it was appraised at $95 after her death). She said good-bye to her tenants, the Haneys, and as Mrs. Haney said, it was quite apparent that she was leaving for good, and intended to establish her home in Florida.

On the morning of May 4 Meredith and his sister picked up Miss Johnston at the nursing home and drove to the airport; where after purchasing a one-way ticket, she and Meredith flew to Miami. On arrival they went to his home and after a short visit there she left all of her belongings except what she would need at the Snapper Creek Nursing Home in Miami where arrangements had been made for her. The records of the home show that group activity and physical therapy were recommended, and that she was sometimes confused and forgetful. She was allowed bathroom privileges and to "ad lib" in a wheel chair. The notes 10 days later say she was cooperative and alert, but forgetful, and it appears that she was able to engage in bingo games and art contests.

During her stay at the home Meredith O'Hara and his wife saw her daily. They helped her to walk around without the wheel chair; they took her out for visits and for dinner on Sundays and on other occasions to the offices of a dentist and of Dr. Broward. During this period also she was un-

decided as to what she wanted to do about living accommodations. She did not require nursing care and could have maintained her own home, if she wished to hire household help. She made inquiries about renting a guest house to live in, and about sharing a house or apartment, and talked about buying property in Miami. Supporting affidavits were submitted by Dr. Broward and a widow home owner to whom inquiries about rental to Miss Johnston were made, setting forth their understanding that she had come to Florida for permanent residence.

As indication of her intention to make Florida her permanent home, Miss Johnston took certain significant steps:

(1) In early May 1969 she advised her former employer that she had moved to Florida and requested that the retirement checks be sent to 9801 West Suburban Drive, Miami, Florida (the home of Meredith O'Hara). This is corroborated by the employer's affidavit, which states in addition that "she unquestionably intended to remain in Florida the rest of her life," and so he changed all of his records accordingly.

(2) She rented a safe deposit box in a South Miami bank on May 26, 1969, and transferred to it all of her securities and important papers, from her box in a New York bank.

(3) She requested Meredith O'Hara to sell her house in Westfield; and according to the first floor tenant, Mrs. Haney, he endeavored to sell it to them.

(4) She opened a brokerage account with the Miami office of a national brokerage firm on June 12, 1969.

(5) She opened a checking account in a South Miami bank.

(6) In each of the above transactions she gave the same Miami address.

(7) On June 25, 1969 she executed a Declaration of Domicile and Citizenship in Dade County, Florida, and filed it with the Clerk of the Circuit Court of that County. The certificate was signed and sworn to by Miss Johnston and recites that she was formerly a resident of Westfield, New

Jersey, that she had changed her domicile to and had become a *bona fide* resident of the State of Florida residing at Meredith O'Hara's address, since May 3, 1969 (the date should have been May 4), and that she had no intention of returning to her former domicile but intended to remain in Miami, Florida, permanently.

The circumstances attending execution of the Declaration of Domicile are indicative of the deliberate quality of the act. As noted above, when Miss Johnston executed her will in the New Jersey nursing home, she made notations on it as to changes or additions she wished made in it. It was retained by the New Jersey attorney for retyping. Although the testatrix departed for Florida the next day, it did not occur to counsel to change the New Jersey residence appearing therein to the Florida address. The redraft was sent to Florida and when executed there the erroneous address went unnoticed. After it had been signed, Meredith O'Hara, who was named executor therein, realized the inadvertence and inquired of a Florida attorney if the New Jersey address would interfere with Florida probate. He was advised that it would not stand in the way, but the attorney suggested that if Miss Johnston definitely intended to stay in Florida permanently, filing of a Declaration of Domicile should be called to her attention. This, it was said, would settle the question. The printed form of Declaration was obtained, signed and sworn to by Miss Johnston on June 25, 1969. The affidavit of the notary before whom it was sworn says that she was alert and businesslike about the matter; insisted that the notarial seal be affixed in her presence and that an extra copy be made for her file.

Miss Johnston became dissatisfied with the Snapper Creek Nursing Home and requested O'Hara to find her another such place. He consulted Dr. Broward who had her transferred to La Posada Nursing Home in Miami on June 26, 1969. The record there gives her address as the O'Hara home in Miami, and says that Meredith O'Hara should be notified in case of emergency. On admission her condition was de-

scribed as alert and ambulatory with assistance. Death occurred unexpectedly at 3:55 A.M. on July 14, 1969 of acute renal failure which had its onset 48 hours earlier. A week before her death, with the approval of the doctor, an appointment had been made with a dentist to remove three of her teeth on July 14. The death certificate gives her usual residence as 9801 West Suburban Drive, Miami, Florida—the O'Hara home.

At the time of Miss Johnston's death the great bulk of her estate consisted of intangible personal property, principally bonds and common stocks. The securities were in her safe deposit box in Florida, as well as her bank account books representing seven savings accounts and one checking account in New York banks, one savings account in a Boston, Massachusetts bank, a checking account in the National Bank of Westfield, New Jersey (the smallest such account), and a checking account in the First National Bank of South Miami, Florida, the largest such account. These accounts constituted roughly one-tenth of her personal estate. The only real property owned in New Jersey was the two-family house in Westfield which was valued at $17,390.

When the New Jersey Transfer Inheritance Tax Bureau raised the question of the taxability of the decedent's estate, a hearing was held on September 17, 1970 in the office of the Westfield attorneys who had drawn her will before she left for Florida. Dr. Gray, the O'Haras, and Mr. and Mrs. Warner, the most informed persons on the question of decedent's domicile at death all testified. The record shows that at the hearing the Bureau was represented by an attorney and by the Examiner who later decided the matter. As each witness completed his testimony on direct examination (except for the Warners who gave some relatively short inconsequential information), the record shows "Cross-examination by" the Examiner, followed by a very short further cross-examination by the Bureau attorney.

On December 15 in a short "finding of fact" the Examiner declared that the decedent's domicile at the time of her death

was New Jersey. The determination contained no analysis of the testimony, affidavits or documents appearing in the record; nor any discussion of the credibility of the assertions of the substantial persons who supported the conclusion of a Florida domicile. Reference was made to the fact that Miss Johnston's will (which was probated in Florida) was drawn in New Jersey and gave her address as the home she occupied in Westfield before leaving this State for Florida. It noted also that on admission to the nursing home on the day of her arrival in Florida, she gave the same address. A brief reference was made, without comment, to the Declaration of Domicile that was filed in Florida by the testatrix. This was followed by the conclusory statement:

On the basis of information, it has been determined that the decedent did not abandon her New Jersey domicile, and that she was, in fact, in Florida for reasons of health.

We granted certification to review this case along with *Lyon v. Glaser,* 60 *N. J.* 259 (1972), involving the substantially similar problem and also decided today. In *Lyon* we set forth the substantive and procedural principles by which the issue of domicile is to be adjudged in such cases. Application of those principles requires a reversal, as in *Lyon,* of the judgment of the Appellate Division which affirmed the transfer inheritance tax assessment on the Johnston estate.

For the reasons expressed in *Lyon,* it is our view that in this case also the Appellate Division should have engaged in a *de novo* review of the facts on the issue of domicile. Under the circumstances we have made an independent study of the record and are satisfied that the greater weight of the credible evidence requires the conclusion that Miss Johnston's domicile was in Florida when she died.

The Bureau argues that the proof does not support a Florida domicile because her residence was limited to two short periods in nursing homes. It points out that she had not acquired a physical permanent home in that State, and

that use of her nephew's address was simply for purposes of convenience. But, as the Appellate Division correctly observed, if a person's residence is actual and accompanied by an intention to remain in the State permanently, the character of the living quarters is immaterial. It may be a nursing home, a hotel, a boarding house; a home in a particular building is not necessary. Put in simplest terms the judicial standard of domicile is essentially equivalent to the lay idea of "home." *In re Estate of Gillmore*, 101 *N. J. Super.* 77 (App. Div.), certif. den. 52 *N. J.* 175 (1968); *In re Simpson's Will*, 136 *N. J. Eq.* 597, 611 (Prerog. Ct. 1945); *King v. King*, 74 *N. J. Eq.* 824, 826 (E. & A. 1908); *In re Publicker's Estate*, 385 *Pa.* 403, 123 *A.* 2d 655 (1956); 25 *Am. Jur.* 2d, *Domicil*, § 22, p. 16 (1966); 28 *C. J. S. Domicile* § 10, p. 14 (1941); *Restatement (Second) of Conflicts of Laws*, § 12, comment b, p. 50 (1971).

Here this aged woman found herself unable to live alone any longer. Her closest relatives in blood and affection lived in Florida, and they invited her to move to that State where they could visit her regularly and look after her. She had spent a number of enjoyable vacations there, and often spoke of making Florida her permanent home. Under the circumstances it was natural that she should decide to leave New Jersey and spend her remaining days in comfort and among compatible relatives. The proofs show that she was a strong-minded woman, who did not want to be a physical burden on anyone. She chose to go into a nursing home on coming to Florida, and the strong indication is that she hoped to rent or acquire independent living accommodations when she became physically able to do so. Unlike the situation in *In re Glassford's Estate*, 114 *Cal. App.* 2d 181, 249 *P.* 2d 908 (1952), relied upon in part by the Appellate Division, where it appeared that Mrs. Glassford never intended to abandon her New York home, the critically important factor here is that regardless of where she lived on coming to Florida Miss Johnston's decision had been made to abandon her domicile in New Jersey and maintain a

permanent abode in Florida. We have no doubt that it can be said, even more fairly here than in *Gillmore, supra,* that she had come "to spend the rest of her days and remained 'with as much permanency as life afford[ed].'" 101 *N. J. Super.* at 91. The use of Meredith O'Hara's address as her residence in connection with her business and other activities in our judgment does not reasonably support the idea that she had not abandoned the New Jersey domicile. On the contrary, it served as strong evidence that she had in fact adopted Florida as her home. And above all it is plain that she never intended to return to New Jersey.

The judgment of the Appellate Division is reversed, and the tax assessment on the intangible personal property of the estate is vacated.

JACOBS, J. votes to reverse and remand for a full trial-type hearing in the Transfer Inheritance Tax Bureau. See *Lyon v. Glaser,* 60 *N. J.* 259 (1972) (dissenting opinion).

*For reversal*—Chief Justice WEINTRAUB and Justices FRANCIS, PROCTOR, HALL, SCHETTINO and MOUNTAIN—6.

*For reversal and. remandment*—Justice JACOBS—1.