605 A.2d 279

IN THE MATTER OF THE SETTLEMENT OF THE ACCOUNTS OF JOSEPH UNANUE AND FRANK UNANUE, TRUSTEES UNDER THE TRUST AGREEMENT DATED NOVEMBER 16, 1970, AS AMENDED, BY AND AMONG PRUDENCIO UNANUE, AS GRANTOR, AND PRUDENCIO UNANUE, JOSEPH UNANUE AND ANTHONY UNANUE, AS TRUSTEES OF SIXTEEN TRUSTS THEREUNDER.

Superior Court of New Jersey
Law Division Probate Part
Bergen County

Decided December 4, 1991.

364

*Crummy, Del Deo, Dolan, Griffinger & Vecchione* (*Michael R. Griffinger*) for Plaintiffs–Beneficiaries.

*Martin T. Durkin* (*Durkin & Boggia, Esqs.*) Guardian Ad Litem for Jorge Unanue, Plaintiff–Beneficiary.

*Quirk & Gallagher* (*Patrick Quirk*) for Joseph Unanue and Frank Unanue, Individually, as executors of the Estate of Prudencio Unanue, and as Trustees under the aforesaid trusts.

*Saiber, Schlesinger, Satz & Goldstein* (*David M. Satz, Jr.*) for Intervenor—Goya Foods, Inc.

*Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart* (*Jan Brody*) for Defendant—Charles Unanue.

MARTIN J. KOLE, J.A.D. (retired and temporarily assigned on recall).

This is a truncated version of a 147 page opinion dealing with the matter of domicile.

Part I contains a summary of the factual findings of the court.

Part II contains selected excerpts from the court's opinion.

## PART I

### SUMMARY OF FINDINGS

The issues in this case relate to the domicile of decedent, Prudencio Unanue on two dates: (1) November 16, 1970, the date he executed, in Brooklyn, New York, an *inter vivos*

revocable trust agreement, under which the ultimate beneficiaries were his grandchildren and the corpus was his majority ownership interest in the then issued and outstanding shares of stock of Goya Foods, Inc.; and (2) March 17, 1976, the date of his death in Puerto Rico. Prudencio also executed a will on November 16, 1970, in Brooklyn, New York, which was probated on August 11, 1976 in Bergen County, New Jersey.

Prudencio's wife was Carolina. Residing with Prudencio and Carolina for much of the time involved in this action was Carolina's sister, Ana Maria. Prudencio and Carolina had 4 sons: Charles, Joseph, Frank and Anthony, all of whom were active in the Goya businesses and were the sole shareholders of corporations that the court found were Goya-related businesses in Puerto Rico, including Puerto Rico Foods Corp. and Caribbean Canneries Inc. Anthony died on March 23, 1976, six days after Prudencio's death. In view of Anthony's death the executors under Prudencio's will and the trustees under the trust essentially were Joseph and Frank.

After a dispute with his father and brothers, in June 1969, Charles was ousted as an officer, director and employee of all of the companies, including Goya. Charles remained a shareholder. Thereafter, extensive litigation ensued, with Charles on one side and his father and brothers on the other. The litigation was settled twice, as a result of which in 1972 and 1974, Charles' interests in the family-related companies were purchased by the other parties for in excess of $4,300,000 and he agreed never to contest the Will or the Trust. This amount was paid in full in 1975.

In this action, Charles contends that his father Prudencio's domicile at all times was in Puerto Rico and not Bergen County, New Jersey; and that, in any event, his domicile became Puerto Rico when he and Carolina left for Puerto Rico in November 1970 and remained there without leaving for New Jersey from that date until his death in March 1976. If Puerto Rico was Prudencio's domicile, Charles claims that under its laws, he is

entitled to part of the Goya shares of stock as a forced heir of Prudencio and a beneficiary under his mother Carolina's will of her community property interest therein.

The court, after detailed factual and legal findings, concluded that Prudencio was domiciled in Tenafly, New Jersey on both dates—November 16, 1970 and March 17, 1976, when he died.

In those findings, the court determined that:

Prudencio came to Puerto Rico from Spain in 1904. He started a business venture in San Lorenzo in 1908 and became friendly with Ramona Falero there, who later claimed he was the father of her child Augusto, born in 1911. He believed, whether correctly or not, that Augusto was his son. In 1911 he became engaged to Carolina, who was residing in San Lorenzo. In 1916, he left for the continental United States, learned English and graduated from a business school in Albany, New York. He then worked and resided in New York City. He returned to San Lorenzo to marry Carolina in 1921. He left Puerto Rico alone soon after his marriage in order to earn a livelihood in the New York City area.

In 1923 and 1924 first Carolina and then Charles, their son (who had been born in Puerto Rico while Prudencio was in New York), joined Prudencio in Brooklyn. Prudencio continued to work in New York City and resided in Brooklyn with his wife and child from 1924 to 1929. Joseph and Anthony were born in Brooklyn. In August 1929, Prudencio and his family moved to New Jersey, residing in a rented house in Ridgefield Park, in which Frank was born; soon thereafter Carolina's sister, Ana Maria, and her brother, Pepe, left Puerto Rico to reside with the family.

In 1934, all of them moved to a rented house in Bogota, which was purchased in Carolina's name in January, 1937. They lived in this house for 28 years, from 1934 to 1962. All of the sons were raised there, went to school in Bergen County, and throughout their attendance at college and military service and until their marriages, resided with their parents in Bogota.

While in Bogota in 1946 and 1956, Prudencio and Carolina, respectively, became naturalized United States citizens. Neither Prudencio nor Carolina visited Puerto Rico from 1923, when Carolina came to live with Prudencio in Brooklyn, until some 26 or 27 years later—in 1949 or 1950.

The Goya company and business was founded by Prudencio in or about 1936, although he was in business for himself in New York City since 1929. Goya's headquarters were moved from Manhattan to Brooklyn in 1958. It again moved, while Prudencio was ill in Puerto Rico, in December 1974, to Secaucus, New Jersey.

With Prudencio's impetus and money, in 1949, his son Charles purchased a cannery in Puerto Rico. Prudencio was then 64 years of age. This served as the nucleus for the formation and operation of the two Puerto Rican businesses. Prudencio had no ownership interest in these businesses. They were owned by his 4 sons. But he was the "boss" of Goya and the Puerto Rican enterprises. By 1969, Charles had become Chief Operating Officer and Chief Executive Officer of all of the companies, including Goya. But, as indicated, Charles was dismissed from these positions in the companies in June 1969.

Commencing in the late 1950's, Prudencio and Carolina, who then resided in Bogota, New Jersey, began routinely to spend the winter months of each year in Puerto Rico—usually from some time in November of each year (generally after Thanksgiving in Bogota) until March or April (generally around Easter) of the following year.

Prudencio's winter visits to Puerto Rico were primarily taken because of pain and discomfort caused by an arthritic condition which began in the 1940's and forced him to walk with a cane by the mid–1950's. During the 1960's, Prudencio's arthritic condition worsened further, and he obtained motorized wheelchairs which he used to travel around the company offices both in New York and in Puerto Rico. The cold New Jersey winters exacerbated the pain resulting from his arthritis. Additionally,

he was afraid he might fall on the ice or snow during the New Jersey cold weather. Prudencio, who was 70 years old in 1956 and 80 years old in 1966, used his trips to Puerto Rico to escape these winters.

While in Puerto Rico, during the 20 years of annual visits there, Prudencio and Carolina would usually stay in various residences (generally apartments) owned or leased by a Puerto Rico company owned by their sons. None of them was owned or leased by Prudencio or Carolina. The apartments varied. Among others, there was a one-room efficiency apartment and an apartment over a retail store.

The last of these company apartments in Puerto Rico was located at 54 Kings Court, Santurce in a building known as Condominium Ashford Park (sometimes "Kings Court apartment"). This apartment was purchased on November 11, 1966 and owned by Charles, who ultimately, in November, 1968, sold it to the Puerto Rico company.

The New Jersey houses of Prudencio and Carolina were larger and far more comfortable than the apartments in Puerto Rico in which they stayed during their winter visits.

In July 1962, Prudencio and Carolina moved from the Bogota residence to a ranch style one-level house at 13 North Summit Street in Tenafly, New Jersey. Prudencio's move from Bogota to Tenafly was prompted by his desire not to climb stairs any longer as a result of his severe arthritic condition.

Prudencio and Carolina enjoyed their New Jersey houses and considered them as home. Prudencio showed the houses with pride to his friends and visitors. He and Carolina were deeply interested in their family—their sons and spouses and their grandchildren. The naturalization papers of Prudencio and Carolina stated that they resided in Bogota, New Jersey. The grandchildren, from time to time, visited at the Bogota and Tenafly houses with and without their parents. Most of them were located in the New Jersey area or in places readily accessible thereto. Some of them stayed over on weekends or

longer. They played with children of neighbors, both in Bogota and Tenafly. Prudencio enjoyed talking to them and watching them play.

Prudencio and Carolina's valuables and sentimentally significant possessions (such as silver, jewelry and prayer books) were always kept in the New Jersey houses in Bogota and Tenafly. When Prudencio and Carolina went to Puerto Rico in November 1970 and in prior years, they took with them only clothing and personal effects in 2 or 3 suitcases. They left the Tenafly house with all of the furniture, most of their clothing and other personalty therein intact. In November 1970, they intended to return to Tenafly, despite Prudencio's advanced age—84.

Prudencio voted in Bogota for Dewey in the election of 1948. He also voted in Bogota in other elections, including 1952 when he voted for Eisenhower. He never voted in any Puerto Rican election. He gave money to the Community Chests of Bogota and, at least in 1962, Tenafly. He had a New Jersey driver's license until the early 1960's, when he stopped driving, and never had one from Puerto Rico. He never paid any income tax in Puerto Rico. He had a bank account in the Bank of Bogota for some period, including the years 1960 and 1962, issuing checks therefrom in July 1960 and September and October 1962. He also had a checking account at the Hackensack Trust Company at some period, including the year 1963. His bank accounts listed his New Jersey address. Although Carolina had a savings account in Puerto Rico, Prudencio had no bank accounts there. He received his Social Security number in New York and Carolina received hers in New Jersey. His 1957 and 1961 passports and 1957 passport application show his address as his house in Bogota; and his 1966 passport application shows his address at his Tenafly house. The naturalization papers of Prudencio and Carolina stated that they resided in Bogota, New Jersey.

During their absences in Puerto Rico before and after November 1970, the Federal and the New York State and City non-

resident income tax returns filed for Prudencio and Carolina contained their New Jersey address as their "home" address. Prudencio's wills, including the November 1970 will, and the November 1970 Trust, recited his New Jersey residence. Prudencio's November 1970 Will incorporated the provisions of the trust, executed on the same day, to the effect that it shall be construed under, and the shares thereunder shall be governed in all respects by, New Jersey law. Carolina executed a will dated October 24, 1964 in which she describes herself as a resident of New Jersey.

Prudencio executed contracts in New York City with his four sons, including Charles, as parties, in which he was described as "a resident of the State of New Jersey". These documents were signed by Prudencio on July 17, 1964, April 22, 1966, and June 20, 1967. There are a great number of other documents throughout the years, including 1969 affidavits, signed by Prudencio in which he referred to his residence as New Jersey.

While Prudencio and Carolina were in Puerto Rico, both before and after November 1970, the Tenafly house was looked after, from time to time, by Joseph and his wife Carmen Ana, as well as their son, Joseph F. Unanue. In 1971 or 1972, the pipes burst. Carmen Ana had the necessary repairs made so that Prudencio and Carolina could return to a fully intact livable house.

The Puerto Rican companies, Caribbean Canneries and Puerto Rico Food Products, had substantial earnings and profits. Prudencio was obviously interested in their operations, sales and profitability, as well as their being an excellent source of income to the members of the Unanue family. Nevertheless, his primary interest always remained with the financial success of Goya itself; and his true emotional attachment always was to Goya. He considered the Puerto Rican enterprises essentially as contributors to the over-all success of the Goya business, good-will and tradename he had founded and nourished. To him, Goya itself was the significant entity or enterprise.

In sum, it was Goya, the largest and most substantial sales operation, which was the center of his business and personal life, rather than the canning and related enterprises in Puerto Rico. His basic interest was sales. Just about every witness who knew him in business characterized him as the "super salesman" and considered salesmanship his abiding concern.

Up to the second half of November 1970, when he left to spend the winter months in Puerto Rico, Prudencio was clearly domiciled in New Jersey. His permanent home was here. His primary business enterprise, Goya, was in New York, to which he commuted from New Jersey to work five and six days per week. When he ceased driving a car, one of his sons who lived near him, took him to Goya. All of the indicia of New Jersey domicile were present. There existed a firmly rooted residence and intent to reside in New Jersey on a permanent basis. His annual trips to Puerto Rico for the winter seasons were essentially for health reasons, and, secondarily, for business purposes and a winter vacation. Thus, as of November 16, 1970, the date of the trust, he was a domiciliary of this State.

In November 1970 Prudencio and his wife left for their usual winter sojourn in Puerto Rico, intending to return to Tenafly.

Despite his intention to return to Tenafly after the November 1970 trip to Puerto Rico, Prudencio did not come back before he died in March 1976. It was during his last winter visit to Puerto Rico, starting November 1970, that he was beset with serious illnesses that continued until his death in March 1976. As a result, he thereafter continued to reside at the Kings Court apartment in Puerto Rico until he died.

Prudencio's first serious illness occurred during his November 1970 trip to Puerto Rico. On January 18, 1971, he was in pain and was brought by Cristobal Colon, an employee at the Puerto Rican facility, to the office of Dr. Ramon Almodovar, a urologist. He had a very distended bladder and had to be catheterized in order to empty it slowly. Almodovar had him immediately admitted to Teacher's Hospital (Del Maestro).

Almodovar found that Prudencio, who was then 84 years of age, had advanced carcinoma or cancer of the prostate; chronic uremia, a very serious illness; and severe chronic arthritis.

On January 9, 1972 Prudencio was hospitalized at the Teacher's Hospital for a stroke,—cerebral thrombosis—, which resulted in paralysis of one half of his body and inability to speak. His internist and cardiologist was Dr. Noguera. Dr. Sanchez–Longo, a neurologist, treated him for the stroke. He was so hospitalized until February 7, 1972.

After his admission on January 9, 1972 to the hospital, Prudencio had a permanent catheter, which Almodovar would change when needed at the hospital and at Prudencio's apartment subsequent to his discharge on February 7, 1972. By the time he returned to the apartment, he was able to move and could understand what was said to him.

Hospital equipment was installed in his apartment so that on discharge he would have available that which would be required had he remained at the hospital. He had three nurses around the clock.

From the 1972 stroke and until some short period before his death in March 1976, Prudencio's physical condition had improved but he never really fully recovered.

Prudencio discussed travel back to New Jersey with Almodovar. Carolina informed Almodovar that she was anxious to get back to her home in New Jersey.

But Prudencio refused to travel with a catheter. He wanted it removed so that he could return to his home in New Jersey, as well as attend to his business in New York. He really believed that Almodovar would cure him sufficiently so that he would not need a catheter.

Charles contends that Prudencio never truly intended to return to New Jersey either before his stroke in January, 1972 or thereafter, since the claimed refusal to travel with the catheter was a sham. The claim is that before January, 1972,

he could have travelled with the catheter. Objectively, that may be so. But the real issue revolves around his subjective feelings in this respect. He believed that it would be uncomfortable and cumbersome to have the catheter and that it would affect his appearance. He also felt that during the time he needed, or there was the highly likely need for, catheterization,—which was almost always—, he wanted to be treated and to have the catheterization handled by or under the supervision of the physician he fully trusted in Puerto Rico—Dr. Almodovar,—who, he said, had performed a miracle. Further, he was already seriously ill with prostate cancer, uremia and other urinary problems and he needed and wanted care by a physician in whom he had faith. Almodovar himself did not believe that, under all of these circumstances, Prudencio could or should travel to the New Jersey area with or without the catheter. Moreover, after his January 1972 stroke and until his death in 1976, Prudencio was obviously much sicker than before; and, though he truly intended to return to New Jersey, in fact, he could not do so because of such illness.

Prudencio's continued stay in Puerto Rico from January 1971 onward constituted a reasonable and legitimate subjective concern and response of a sick person in an endeavor to effect a cure of his illness, particularly at his advanced age.

From November 1970 through March 17, 1976, the substantial majority of Prudencio and Carolina's grandchildren lived in the United States and four lived in Puerto Rico. One of the reasons that Prudencio and Carolina desired to return to New Jersey was to be near most of their grandchildren, including Charles' sons, Jeffrey and Randall, who they believed had been abandoned by Charles. During visits to Puerto Rico by, and in telephone calls from, some of the grandchildren, Carolina and Prudencio informed them about their intent to return to Tenafly.

Further, both Prudencio and Carolina were dissatisfied with the relative smallness and inconvenience of the Kings Court

apartment, as compared to the larger and much more livable Tenafly house. They complained to others, including Almodovar and Sanchez–Longo about this.

Prudencio and Carolina also informed friends and relatives, such as Cristobal Colon and Joseph's mother-in-law, Santos, about their intent to return to their New Jersey home.

These declarations of intent to return, as well as the recitals in the various documents as to a New Jersey residence and the like, were made in good faith and without any design to mislead.

## PART II

### EXCERPTS FROM OPINION *

### LAW OF DOMICILE

The following represents the New Jersey law of domicile, with the exception of the matter of burden of proof and going forward with evidence.

■ "In a strict legal sense, the domicile of a person is the place where he has his true, fixed, permanent home and principal establishment, and to which whenever he is absent, he has the intention of returning, and from which he has no present intention of moving." *Kurilla v. Roth*, 132 *N.J.L.* 213, 215, 38 *A.*2d 862 (Sup.Ct.1944). This identification of domicile with the concept of home continues to have vitality in New Jersey. *See, Citizens Bank & Trust Co. v. Glaser*, 70 *N.J.* 72, 357 *A.*2d 753 (1976). "Home is the place where a person dwells and which is the center of his domestic, social and civil life." *Citizens Bank & Trust Co. v. Glaser*, 70 *N.J.* at 81, 357 *A.*2d 753, *quoting Restatement* 2d *Conflict of Laws* (1971), § 12. In that case, the court stated that "the overwhelming proportion of the

---

* Some of these excerpts have been minimally modified in the interest of brevity.

indicia as to what the decedent regarded as her real, principal and permanent home ... as well as the central fulcrum of her life must here be found to converge ..." in that location found to be her domicile. *Citizens Bank & Trust Co. v. Glaser,* *supra* at 82, 357 *A.*2d 753. Thus, the concepts of home and domicile mean more than physical residence. They also embody the subject's objective and subjective relationship to that residence.

A person may establish a domicile in one place and then *acquire a* second residence. This does not lead to multiple domiciles, for it "is everywhere conceded that a person can have only one true domicile, which is synonymous with the common understanding of the word 'home' ". *State v. Benny,* 20 *N.J.* 238, 251, 119 *A.*2d 155 (1955). If a person maintains multiple residences it may become necessary to determine which one is the true domicile. Various approaches to this problem have been used by New Jersey courts.

Establishing a domicile involves an act of volition. "A person has the right to choose his own domicil, and his motive in doing so is immaterial." *Lyon v. Glaser,* 60 *N.J.* 259, 264, 288 *A.*2d 12 (1972). In accordance with this principle it has been held that one does not relinquish his domicile by having another residence based on reasons of health, society, business or employment. *See Rosenberg v. Universal Underwriters Insurance Co.,* 217 *N.J.Super.* 249, 256, 525 *A.*2d 349 (Law Div.1986), aff'd 224 *N.J.Super.* 638, 541 *A.*2d 246 (App.Div. 1988), certif. den. 113 *N.J.* 333, 550 *A.*2d 449 (1988); *Collins v. Yancey,* 55 *N.J.Super.* 514, 521, 151 *A.*2d 68 (Law Div.1959); *Cromwell v. Neeld,* 15 *N.J.Super.* 296, 301, 83 *A.*2d 337 (App. Div.1951); *In re Michelsohn,* 136 *N.J.Eq.* 387, 390, 37 *A.*2d 118 (Prerog.Ct.1944). Additionally, it has been held that a change of domicile "may be made to avoid taxation ... [or some other motive], so long as the necessary ingredients for establishment of the new domicil are present." *Lyon v. Glaser,* 60 *N.J.* at 264, 288 *A.*2d 12. Even a change of domicile predicated on a

desire to avoid a forced heirship statute has been upheld when the change was supported by other indicia of a new domicile, *Succession of Barnes*, 490 *So.*2d 630 (La.App. 2 Cir.1986).

It is clear, therefore, that a choice of domicile by a person, irrespective of his motive, will be honored by the court, provided there are sufficient objective indicia, by way of proofs, supporting the actual existence of that domicile.

Thus, a person may not arbitrarily designate a given residence as his domicile. It is necessary that the requisite subjective intent be present since domicile is "very much a matter of the mind—of intention." *Lyon v. Glaser, supra.* "Where there are multiple residences ... domicile is that place which the subject regards as his true and permanent home." *Citizens Bank & Trust Co. v. Glaser, supra* 70 *N.J.* at 81, 357 *A.*2d 753.

"When a man has acquired a domicile in a particular place, that place remains his domicile until he acquires another domicile". *In re Dorrance*, 115 *N.J.Eq.* 268, 274, 170 *A.* 601 (Prerog.Ct.1934), aff'd 13 *N.J.Misc.* 168, 176 *A.* 902 (Sup.Ct. 1935), aff'd 116 *N.J.L.* 362, 184 *A.* 743 (E & A 1936), cert. den. 298 *U.S.* 678, 56 *S.Ct.* 950, 80 *L.Ed.* 1399 (1936), reh den. 298 *U.S.* 692, 56 *S.Ct.* 957, 80 *L.Ed.* 1410 (1936). In considering whether a change of domicile has occurred, three elements must be considered: 1) whether there had been an actual and physical taking up of an abode in a particular state; 2) whether the subject had an intention to make his home there permanently or least indefinitely; and (3) whether the subject had an intention to abandon his old domicile. The court must evaluate all of the facts of the case to determine the place in which there is the necessary concurrence of physical presence and an intention to make that place one's home. *Lyon v. Glaser, supra,* 60 *N.J.* at 264–265, 288 *A.*2d 12. *See also Mercadante v. The City of Paterson*, 111 *N.J.Super.* 35, 39–40, 266 *A.*2d 611 (Ch.Div. 1970), aff'd o.b. 58 *N.J.* 112, 275 *A.*2d 440 (1971).

In the *Lyon* case, as well as in its companion case, *O'Hara v. Glaser*, 60 *N.J.* 239, 288 *A.*2d 1 (1972), the Supreme Court

focused particular attention on the subjects' intention to abandon their old domiciles. On the other hand, in *Cromwell v. Neeld, supra,* the Appellate Division found that the subject had not been shown to have abandoned her New Jersey domicile in favor of a New York residence, despite the fact that she had spent the last five and a half years of her life and died at the New York residence. 15 *N.J.Super.* at 302, 304–305, 83 *A.*2d 337.

■■ New Jersey courts also consistently hold that once established, a domicile continues until superseded by a new domicile. *See, e.g., Lyon v. Glaser, supra; Cromwell v. Neeld, supra; In re Dorrance, supra.* Accordingly, once one party in a domicile contest establishes firmly that the subject was domiciled in a particular location at a particular time, if the adverse party seeks to establish that the subject was ultimately domiciled in some different location, he must demonstrate, in accordance with the types of evidence and standards discussed herein, and the proof burdens hereafter set forth, that the subject did in fact effect a change of domicile.

■ Subject to contradiction, recitals as to domicile in a will, trust, tax return or other formal document, as well as statements to others as to domicile, are evidential of the actual domicile. But they are not at all conclusive. They are of value evidentially to the extent that they are not intended to deceive and other proofs support such domicile. The same principle applies to a provision in a will or trust, stating that the laws of a specific state shall govern or that it shall be administered in accordance with the law of such a state, at least where the residence expressed therein of the testator or settlor is in that state. *Trustees of Princeton University v. Trust Co. of N.J., supra,* 22 *N.J.* 587, at 595–596, 127 *A.*2d 19; *Lyon v. Glaser, supra,* 60 *N.J.* at 267, 288 *A.*2d 12; *Cromwell v. Neeld, supra,* 15 *N.J.Super.* at 304, 83 *A.*2d 337. *Cf. In Re Pfizer,* 33

N.J.Super. 242, 110 A.2d 40 (Ch.Div.1954) aff'd o.b. 17 N.J. 40, 110 A.2d 54 (1954).

█ Prudencio's confinement to Puerto Rico by reason of ill health from January 1971 until his death on March 17, 1976, at 90 years of age, was involuntary, was never intended to be permanent and cannot be considered a change of domicile to Puerto Rico from New Jersey. *See Cromwell v. Neeld,* 15 *N.J.Super.* 296, 301, 83 *A.*2d 337 (App.Div.1951); *In re Michelsohn,* 136 *N.J.Eq.* 387, 390, 37 *A.*2d 118 (Prerog Ct.1944); *State of Texas v. Florida,* 306 *U.S.* 398, 59 *S.Ct.* 563, 83 *L.Ed.* 817 (1939). *Cf. Collins v. Yancey,* 55 *N.J.Super.* 514, 151 *A.*2d 68 (Law Div.1959). *See also,* the following cases, where the court held that no change of domicile had occurred even though the person involved spent the last years of life and died in the foreign jurisdiction: *Trust Co. of N.J. v. Spalding,* 125 *N.J.Eq.* 66, 4 *A.*2d 401 (Ch.Div.1939); *Taormina v. Taormina Corp.,* 78 *A.*2d 473 (Del.Ch.1951); *In re Glassford's Estate,* 114 *Cal. App.*2d 181, 249 *P.*2d 908 (1952); *In re Estate of McKinley,* 461 *Pa.* 731, 337 *A.*2d 851 (1975); *Succession of Thompson v. Harrington,* 502 *So.*2d 229 (La.Ct.App.1987).

A change of domicile, however, is effected if a person actually moves to a new abode intending to remain there for an indefinite time and establishing it as a place of fixed present domicile, notwithstanding that he entertains merely a possibility, or floating intention, of returning to his former domicile at some later time. *Shenton v. Abbott,* 178 *Md.* 526, 15 *A.*2d 906; *Gilbert v. David,* 235 *U.S.* 561, 35 *S.Ct.* 164, 59 *L.Ed.* 360 (1915).

An essential element in determining whether or not the absence for purposes of health equates with a change of domicile is the degree to which the former residence has in fact been abandoned. *Kennan, A Treatise on Residence and Domicile,* (1934) pp. 264–265. In *Texas v. Florida, supra,* the Supreme Court held that the burden of proving a change in domicile is not sustained by a showing of periods of winter residence in obedience to the demands of health, absent evidence of other indicia of a change of domicile.

I find that Prudencio did not move in November 1970 to Puerto Rico intending to remain there indefinitely or to establish it as his domicile while entertaining a mere possibility, floating intention or vague desire of returning to New Jersey later. There are no credible proofs, or reasonable inferences therefrom, that his visit to Puerto Rico in November, 1970 was intended to be other than the usual temporary stay there. Throughout his stays in Puerto Rico, even while he was ill after November 1970, he always actually intended to return to New Jersey and reside in his New Jersey home. That intention was never abandoned, even when to others, in view of his physical condition, it appeared that it could not be fulfilled.

Charles advances essentially three theories of Puerto Rican domicile.

His first theory is that, from the very beginning, when Prudencio first came to Puerto Rico or at the very least upon his marriage to Carolina, Prudencio always considered and wanted to consider Puerto Rico as his permanent residence and the permanent place where he was domiciled or belonged. This was Prudencio's own decision. However, it also fitted in with a promise he made to Carolina and to her sister, Ana Maria, who was living with them, that they would eventually live permanently in Puerto Rico where both women would be more comfortable among people of a similar culture and language.

Hence, Charles claims that the long period of Prudencio's residence in New York and New Jersey with his family was simply for the purpose of earning the wherewithal and to build up his business here financially so that eventually he could return to his permanent home in Puerto Rico.

Charles asserts that Prudencio commenced this program of eventual return to Puerto Rico as a domiciliary without jeopardizing his business interests in a "transitional way" starting in 1949. It was then that he had his sons open the business in Puerto Rico in order to develop, in a major fashion, that part of the business. Prudencio returned permanently, according to

Charles, in 1970, thereby completing his always held purpose and intent of permanently residing, and remaining for the rest of his life, in Puerto Rico. According to Charles, the length of Prudencio's stay in New York and New Jersey is without significance, since he never consciously adopted New Jersey or New York as his domicile or permanent place of residence. He argues that even though Prudencio continued to postpone his return to Puerto Rico, his intent, essentially from the very beginning, was always to be domiciled there and he never intended to be permanently a resident of New Jersey or New York.

There is no credible evidence, nor are there reasonable inferences from any of the evidence, to support Charles' first theory of Prudencio's domicile as being in Puerto Rico.

There are just no facts or sufficient proofs here to support the proposition relied on by Charles in asserting this theory of domicile, as set forth in the following quotation from *Lyon v. Glaser*, 60 *N.J.* 259, 264, 288 *A.*2d 12 (1972):

> A very short period of residence in a given place may be sufficient to show domicil, but mere residence, regardless of its length, is not sufficient. It has been said that concurrence, even for a moment, of physical presence at a dwelling place with the intention of making it a permanent abode, effects a change of domicil.

Charles' second theory of Puerto Rican domicile is predicated on his assertion that the indicia of New Jersey domicile are part of a fictional New Jersey domicile strategy that was suggested to Prudencio by his attorney, Mr. Siegel, for the purpose of defeating any claim to his assets or estate by his alleged illegitimate son, Augusto Falero, as a forced heir under Puerto Rican law. The claim is that this fictional domicile plan commenced no earlier than January, 1966 and that sometime during that year, Prudencio was given instructions by Siegel as to how to maintain minimal contacts in New Jersey to demonstrate that his domicile was in New Jersey and not Puerto Rico even though, in fact, his real domicile was in Puerto Rico. This strategy, according to Charles, was continued by Prudencio and

perhaps Charles' brothers, Joseph, Anthony and Frank, in or about 1969 or 1970, to include not only Falero but also Charles, in order to defeat Charles' forced heirship rights against Prudencio's assets or estate.

Charles' third theory of Puerto Rican domicile is that Prudencio, before November 1970, deliberately wound up his affairs by, among other things, executing the Trust and the Will, and returned to Puerto Rico with Carolina and Carolina's sister, for the purpose of staying there permanently. His intent to do so was already formed at the time the Trust and Will were executed in November 1970. He decided to make this permanent move while he was about 84 years of age and after he learned that he was very seriously ill—either with prostate cancer or otherwise. Accordingly, even if New Jersey were his domicile before November 1970, his intent to return to, and his return to, Puerto Rico, effected a change of domicile, so that from and after November 1970, and at the time the Trust and Will were executed in November, 1970, and until his death in March 1976, his domicile was in Puerto Rico, not New Jersey.

There is no credible evidence or reasonable inferences from any of the evidence, to support Charles' second or fictional New Jersey domicile thesis.

I have found as a fact that Prudencio truly believed the following: that he did have an illegitimate son in Puerto Rico before he married Carolina; that the son was Augusto Falero; and that the child's mother was Ramona Falero. I am not making any finding as to actual paternity.

But Charles, whose evidence supports this finding, would use it as the predicate of a plan or conspiracy by Prudencio, on the advice of his attorney, Samuel Siegel, to establish the indicia of a fictional domicile in New Jersey so as to deprive Falero of his forced heirship rights under the law of Puerto Rico.

Among other things, Charles cites as evidence of a fictional domicile provisions in Prudencio's wills prior to November 1970.

Charles contends that the provisions in the early wills commencing with that of October 24, 1964 through October 9, 1969 directing New York probate and administration and that none of the estate assets be remitted to any jurisdiction other than New York constitute evidence of the plan and conspiracy by Siegel and Prudencio to establish a fictional domicile for Prudencio in New Jersey.

There is no explanation in the proofs for these unusual provisions in the wills. The reason for them are a matter only of speculation. One may surmise, for example, that as a New York attorney, Siegel wanted to be able to represent the estate by having probate in, and the assets confined to, New York; or, as plaintiffs contend, that this is consistent with usual choice-of-law provisions found in form books and also found in Charles' will.[1]

But I do not find that it is even in the realm of speculation that these provisions evince or support a plan to establish a fictional New Jersey domicile. I have already concluded that there is no credible proof as to any such plan or conspiracy. I note that at trial Charles expressly stipulated that the claimed conspiracy did not commence before January 1966. The first will provision relied on as proof of the plan is dated prior thereto, October 1964. Further, these will provisions do not appear in the November 16, 1970 will. Additionally, that will, by incorporating the trust provisions of the same date, makes it clear that the will provisions shall also be governed, as is the trust, by New Jersey law. That kind of language here—expressly referring to New Jersey law as governing the trust and the will,—is evidence which supports a finding of a New Jersey domicile.

---

[1]As a general rule, the administration or construction of a testamentary trust is governed by the law of the testator's domicile, except where the will provides that the law of some other jurisdiction shall control. *In re Pfizer, supra,* 33 *N.J.Super.* at 258–259, 110 *A.2d* 40.

Even if these documents are viewed as a self-declaration of non-Puerto Rican domicile for the motive indicated, there are more than sufficient evidential objective indicia of New Jersey domicile to establish that that was in fact his true, fixed permanent home—*i.e.,* his domicile—until the date of his death on March 17, 1976. Under these circumstances a motive to avoid forced heirship rights by maintaining such a domicile will not change the result. *Trustees of Princeton University v. Trust Co. of N.J., supra,* 22 *N.J.* at 596, 127 *A.*2d 19; *Lyon v. Glaser, supra,* 60 *N.J.* at 264, 288 *A.*2d 12; *Cf. Succession of Barnes, supra.*

Charles' third theory of domicile is without merit. That theory is that before November 1970, Prudencio, then 84 years old and knowing he was ill, deliberately wound up his affairs, which included the execution of the Trust and the Will, and returned to Puerto Rico with Carolina and her sister, Ana Maria, in order to stay there permanently. I have found that the proofs do not support any such intent or conduct by Prudencio and that the November 1970 trip to Puerto Rico was made with the usual intent to return to Tenafly after the winter months.

Charles claims that there is a factual basis for a finding that Prudencio, by the time he executed the Will and the Trust in November 1970, had already wound up his affairs in New Jersey–New York and Spain in order to settle permanently in Puerto Rico.

Charles requests the court to make many inferences adverse to plaintiffs in this respect, as well in others. He claims that such inferences are warranted by reason of plaintiffs' failure to offer available proofs that would refute the contentions he has made on the basis of the evidence he has presented.

Thus, he cites the following as evidential of Prudencio's visit to Spain in October–November, 1970: (1) The opening of a Spanish bank account in the joint names of Prudencio and Joseph, in which the first deposit was made on December 4,

1970; (2) An extrapolation from a comparison of Prudencio's records of his various Mimaya Hospital hospitalizations, which would show that for the first time, in his December 3–5, 1970 record, he apparently stated that he was seen by Dr. Pena in Spain for dyspepsia and constipation; (3) A comparison or interpretation of Prudencio's October 23, 1970 will and his November 16, 1970 will with respect to bequests to his brother and sisters in Spain, which it is claimed show that Prudencio went to Spain between October 23 and November 16, 1970 and withdrew funds in his Spanish bank accounts. The October will bequeathed $15,000 which specifically could be satisfied with Spanish bank account funds. The November will, as prepared, did not provide for a $15,000 bequest; instead, it provided a bequest of "any cash sum on deposit at" his death in his Spanish bank accounts. Before the will was executed, however, this typewritten clause was stricken in writing and replaced with a handwritten bequest of simply $15,000. Skadden Arps prepared the wills and Maurice Roche, a Skadden Arps partner, witnessed the November will.

Additionally, Charles contends at least one other issue—not directly related to Prudencio's alleged windup of affairs to return to Puerto Rico—was not responsively addressed by plaintiffs' proofs.

Charles testified that the dispute (which eventually led to his discharge) between him, on the one hand, and his brothers and father, on the other, in 1968 and 1969 centered, in part, around his discovery that Joseph had made false entries in Goya's ledgers known as the "advance payment books." Charles asserts that as a result of these false entries Goya did not bill Caribbean Canneries for payments it made on behalf of Caribbean to tomato paste suppliers in Portugal, which shipped the paste directly to Caribbean; and that this reduced Goya's profits and Federal income taxes, while increasing the tax exempt profits of Caribbean. Charles also testified that on May 26, 1969, he took possession of the two advance payment books for the years 1967 to 1969 from Conrad Colon, who was

employed by Goya Foods at that time and was the custodian of the ledgers. Charles' receipt bearing that date reads as follows: "Received from Colon two (2) advance payment books 1967/1969 s/Charles Unanue."

By letter dated July 10, 1969, a copy of this receipt was mailed to David Orlan, Esq. of Casey, Lane & Mittendorf, who had been Charles' attorney prior to the date of that letter, by Barry H. Garfinkel, Esq. of Skadden Arps, attorneys for Goya Foods. The letter stated:

> On or about May 26, 1969, your client Mr. Charles Unanue, requisitioned and then removed from the corporate premises two Advance Payment Books belonging to Goya Foods, Inc. A copy of the receipt therefor is annexed hereto. As your client is no longer an officer or director of Goya Foods, Inc., we, on behalf of our client, Goya Foods, Inc., demand that these two Advance Payment Books be immediately returned to that Company.

Charles asserts that the letter and receipt clearly indicate the existence of two ledgers known to Charles, Conrad Colon, Garfinkel and his client, Goya Foods, as the "Advance Payment Books." Charles testified that he had given the books to his attorney but that his attorney returned them as requested to Garfinkel without his knowledge and pursuant to some collusive arrangement between his attorney and Skadden Arps. They were never returned, nor were copies retained by his attorney. Joseph and Frank testified that the advance payment books never existed. Charles states that the two persons who could shed light on the existence of the books, or the fiction of their existence, and the circumstances surrounding Garfinkel's letter, would have been Conrad Colon and Garfinkel. If they had testified, it is said, the credibility of the testimony of Joseph and Frank in this respect could have been explored more fully.

Charles also asserts that plaintiffs failed to present evidence to rebut his contention that the *inter vivos* trust, a departure from prior testamentary trusts, was intended to insulate the Goya shares from claims of Falero and Charles had they remained in the estate, even though Prudencio was domiciled in Puerto Rico. But plaintiffs have offered a rational explanation:

the purpose was to remove Prudencio's shares from the provisions of a June 20, 1967 shareholder's agreement, which, at his death, would have to be sold for their nominal book value.

But there is no obligation on plaintiffs to offer evidence simply because Charles raises possible inferences from proofs he presented, which may indeed be ambiguous or conjectural in nature. Such proofs do not require plaintiffs to present evidence to fill in the gaps or suffer adverse inferences if they do not do so. *McCormick on Evidence*, (3d. Ed.) sec. 272, at 804–808 (pointing out, in part, that the availability of modern discovery procedures serves to diminish both the justification and the need for the adverse inference). *See also, Long v. Landy*, 35 *N.J.* 44, 54, 171 *A.*2d 1 (1961).

Here, at the very least, Charles should have endeavored to subpoena and call the claimed absent witnesses, considered by him to be significant or essential to bolster his version of the events involved and to fill in what he perceived to be important gaps in plaintiffs' response to his case.

Conrad Colon could have been subpoenaed, since he works at Goya's Secaucus office. Garfinkel, who was in court, also could have been subpoenaed. An attempt should have been made to compel the appearance and testimony of Roche or any other Skadden Arps' attorney involved in the preparation of the November 1970 will and trust to shed light on the reasons, if any, Prudencio gave for the handwritten change in that will or the use of the *inter vivos* trust. The attorney-client privilege might have been invoked by the attorneys. But the availability of that privilege is truly questionable. Garfinkel would be testifying with respect to a matter disclosed in his own letter to Charles' attorney, including whether the advance payment books were returned, and the other attorney (assuming Garfinkel was not aware of the reason for the will change or the trust) would have been compelled to disclose what Prudencio said at the time the will was changed or the trust was executed. In any event, a ruling of the court could have been sought with

respect to the assertion of any such privilege either by the attorney or the client. And, of course, Charles would not be bound by the testimony of any such witnesses. Their testimony, just as that of any other witness, would be subject to the court's assessment of credibility. *See Becker v. Eisenstodt,* 60 *N.J.Super.* 240, 248–249, 158 *A.*2d 706 (App.Div.1960); *Lerman v. Lerman,* 245 *N.J.Super.* 312, 316–318, 585 *A.*2d 425 (Ch.Div. 1990); *In re Subpoena Duces Tecum Inst. Management Corp.,* 137 *N.J.Super.* 208, 213, 348 *A.*2d 792 (App.Div.1975); *Marxe v. Marxe,* 233 *N.J.Super.* 247, 251, 558 *A.*2d 522 (Ch.Div.1989); *Evid. Rule* 26(2)(b); *Ervesun v. Bank of New York,* 99 *N.J.Super.* 162, 171–172, 239 *A.*2d 10 (App.Div.1968), certif. den. 51 *N.J.* 394, 241 *A.*2d 11 (1968); *Balazinski v. Lebid,* 65 *N.J.Super.* 483, 494, 168 *A.*2d 209 (App.Div.1961). *See also, Matter of Estate of Rogers,* 245 *N.J.Super.* 39, 44, 583 *A.*2d 782 (App.Div. 1990) (a court possesses the inherent power to require a nonparty to give evidence).

During trial Charles' attorney demonstrated that he was a skilled examiner of witnesses. He was also most effective in obtaining favorable evidential and other rulings by the court. Had Charles tried to fill the gaps he claims exist by the calling of these witnesses, it may well be that he would not have had to rely on adverse inferences from the failure of plaintiffs to present such testimony.

Under all of these circumstances, I will not make the requested adverse inferences. *See State v. Clawans,* 38 *N.J.* 162, 170–175, 183 *A.*2d 77 (1962); *Wild v. Roman,* 91 *N.J.Super.* 410, 220 *A.*2d 711 (App.Div.1966); *State in Interest of J.L.W.,* 236 *N.J.Super.* 336, 345–346, 565 *A.*2d 1106 (App.Div.1989).

In support of the position that Prudencio intended to retire to Puerto Rico permanently in November 1970, Charles relies on the contents of Prudencio's death certificates, as well as other evidence allegedly confirming such retirement. Such evidence is also claimed to be supportive of at least a permanent retire-

ment in Puerto Rico in January 1972 when Prudencio had his stroke.

Dr. Noguera signed the death certificates and Frank Unanue signed as the "informant" thereon.

I am satisfied that the source of the information in the March 1976 death certificates was Frank, despite his testimony to the contrary. All of the certificates list him as the "informant" and he signed them as the "informant." But there are sufficient problems with the data appearing thereon that he allegedly submitted to warrant the conclusion, which I make, that the contents of these certificates are entitled to little, if any, weight on the issue of Prudencio's domicile. Something obviously was changed when the data was inserted in the blank spaces on the certificates by typewriter after Frank signed the certificates as informant. Either Frank hurriedly gave the information without thought or the person to whom it was given was in error in completing the certificates.

The circumstances surrounding the death of a member of a family, as well as the reliability and care of those who actually insert the information given by the family informant, make the information in the death certificates here of no significant evidentiary force as to the truth and accuracy thereof on the issue of domicile. *See Lyon v. Glaser, supra,* 60 *N.J.* at 268–269, 288 *A.*2d 12. *See also, Bainhauer v. Manoukian,* 215 *N.J.Super.* 9, 44, 520 *A.*2d 1154 (App.Div.1987).

Charles claims that, by virtue of Prudencio's alleged stuporous condition during the last six months of his life, he must be deemed to have died as a domiciliary of Puerto Rico.

Assuming, without deciding, that Prudencio was stuporous during this period, that is no basis for concluding that at death his domicile was Puerto Rico, in light of the proofs in this case relating to his established New Jersey domicile.

The case of *In re Estate of Gillmore,* 101 *N.J.Super.* 77, 87–91, 243 *A.*2d 263 (App.Div.1968), certif. den. 52 *N.J.* 175, 244 *A.*2d 304 (1968), cited by Charles, does not support his claim.

That case involved, according to its opinion, "unique circumstances." The court there held that an incompetent, who, at the time she left her New York home to live in New Jersey, was "so advanced in senility that she did not possess the requisite mental capacity to make a new domicile by choice," acquired a domicile in New Jersey by operation of law. The fact pattern in *Gillmore* is so different from the facts in the instant case as to make that unusual case without any precedential value here. The mere fact that Prudencio may have been physically or mentally incapacitated for a short period of time—even six months—does not mean that, throughout his stay in Puerto Rico and his residence in the United States, he did not intend New Jersey to be his permanent home. *Cf. O'Hara v. Glaser, supra,* 60 *N.J.* at 248–249, 288 *A.*2d 1; *Cromwell v. Neeld, supra; In re Michelsohn, supra; Shenton v. Abbott, supra;* and other cases *supra,* relating to death in another jurisdiction in which the person resided for some time. Unlike the situation in *Gillmore,* Prudencio had not come to spend the rest of his days in Puerto Rico and remain there "with as much permanency as life affords"; nor, as in *O'Hara,* was it at all plain that he never intended to return to New Jersey.

## PROOF BURDENS AND CONCLUSION

I have found that Prudencio's long period of residence in New Jersey on or before November 16, 1970, predicated on all of the credible evidence, clearly established a New Jersey domicile for him as of that date. I have also found a New Jersey domicile until he left for Puerto Rico in November 1970. Since no person is ever without a domicile, a presumption arises that Prudencio continued as a domiciliary of New Jersey until it is proven that he acquired a new domicile in Puerto Rico. *Lyon v. Glaser, supra,* 60 *N.J.* at 277–278, 288 *A.*2d 12. As a result of this presumption, Charles Unanue, who claims that Puerto Rico became or was Prudencio's domicile before his death, had the duty of going forward with evidence to rebut the presumption of a continued New Jersey domicile by showing the physi-

cal assumption of a home in Puerto Rico, accompanied by an intention to acquire a new domicile there and to abandon the old New Jersey domicile. The existence of certain factors weakens the force of the presumption of continued domicile. For example, a home or residence in another state or country is commonly regarded as prima facie evidence of a new domicile, and the longer the period of the new residence the stronger this prima facie case becomes. Such proof of residence elsewhere returns the burden of going forward with proof that Prudencio's New Jersey domicile was not abandoned to the proponents of continuance of that domicile. *See also, Citizens Bank & Trust Co. v. Glaser, supra,* 70 *N.J.* at 81, 357 *A.*2d 753.

I am satisfied that Charles Unanue has not rebutted the presumption that a New Jersey domicile continued as of November 16, 1970, when the trust agreement was executed, and at such time in November when Prudencio left for Puerto Rico. But once Prudencio remained and resided in Puerto Rico for the lengthy period of time between November, 1970 and his death on March 17, 1976, a presumption or *prima facie* case of Puerto Rican domicile was established in Charles' favor.

The burden was then on plaintiffs to prove by a preponderance of the evidence that Prudencio had not abandoned New Jersey as his domicile while thus residing in Puerto Rico. Plaintiffs have met that burden.

Plaintiffs have also plainly carried the overall burden of persuasion by proving, by a preponderance of the evidence, that Prudencio's domicile was always in New Jersey and that he never abandoned or intended to abandon that domicile on or after his stay in Puerto Rico from any time in November 1970, until his death.

As I pointed out during trial, there are other flexible formulations of who should carry the burden of proof or persuasion, established in other contexts by the Supreme Court. *See e.g., Lascari v. Board of Educ.,* 116 *N.J.* 30, 45, 560 *A.*2d 1180 (1989); *Romano v. Kimmelman,* 96 *N.J.* 66, 89, 474 *A.*2d 1

(1984). But the governing law relating to the proof of domicile has been firmly declared in the *Lyon* and *Citizens Bank and Trust Co.* cases. I am following the principles clearly set forth in those opinions and find no reason to depart therefrom in this case.

In any event, as indicated, I have determined that even if plaintiffs had the ultimate burden of persuasion or proof of New Jersey domicile both prior to and after November, 1970, under *Lascari* and *Romano*, they have sustained that burden as well. Charles' evidence, even if considered in the aggregate, does not undermine or overcome the persuasive proofs presented by plaintiffs as to Prudencio's New Jersey domicile until his death in 1976.

Accordingly, I conclude that plaintiffs have established by the proofs that Prudencio was domiciled in New Jersey when the trust agreement was executed on November 16, 1970 and at his death in Puerto Rico on March 17, 1976.